**James W. McCORD, Jr., Appellant,**

v.

**F. Lee BAILEY et al.**

**No. 79–1085.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1979.

Decided Sept. 9, 1980.

Rehearing Denied Oct. 15, 1980.

---

Rufus King, Sr., Washington, D. C., with whom Rufus King, III, Washington, D. C., was on the brief, for appellant.

Barry E. Cohen, Washington, D. C., with whom Roger E. Zuckerman, Roger C. Spaeder, Richard A. Stanley, and Wendy K. Manz, Washington, D. C., were on the brief, for appellees.

Before TAMM[*] and WALD, Circuit Judges, and PHILIP NICHOLS, Jr.,[**] Judge, United States Court of Claims.

Opinion for the court filed by Circuit Judge TAMM.

Opinion filed by Circuit Judge WALD, concurring in part and dissenting in part.

TAMM, Circuit Judge:

With this action we are called upon to review yet another canto in the seemingly ceaseless saga of Watergate. Plaintiff James McCord, Jr., sued his criminal trial attorneys, defendants F. Lee Bailey, Gerald Alch, and the firm of Bailey, Alch & Gillis, for malpractice, conspiracy to represent incompetently, and conspiracy to deprive civil rights. The district court granted defendants' motion for summary judgment. McCord appeals. We agree with the district court that either collateral estoppel or McCord's failure to show that he has suffered any legally cognizable injury precludes McCord's malpractice action; we also believe, however, that McCord may have a colorable claim under the first clause of 42 U.S.C. § 1985(2) (Supp. II 1978). We therefore reverse the decision of the district court and remand the case for further proceedings not inconsistent with this opinion.

I

In June of 1972, Washington's Metropolitan Police arrested McCord with four others at the Democratic National Committee headquarters. McCord was tried in federal district court, and eventually convicted of burglary, possession of intercepting devices, interception of oral and wire communications, and conspiracy to commit these offenses. McCord then petitioned the trial court for relief in the nature of a writ of error coram nobis, raising in part allegations of ineffective counsel at the criminal proceedings. McCord claimed that his attorneys had been disloyal because they dis-cussed his case with attorneys for the other defendants and with some of McCord's co-conspirators, because they failed to cross-examine key government witnesses with sufficient vigor, and because they did not raise a defense of official authorization for McCord's acts. The district court denied McCord's petition in late 1973. McCord appealed this decision and his conviction the following year, repeating his claim of ineffective assistance of counsel as one ground for reversal. This circuit, sitting en banc, discussed these contentions in detail, found them meritless, and affirmed the conviction. *See United States v. McCord*, 509 F.2d 334, 343–45, 351–53 (D.C.Cir. 1974) (en banc), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

In August of 1975, McCord sued his criminal trial attorneys on four counts: negligent and careless representation, intentionally incompetent representation, conspiracy to represent incompetently, and conspiracy to deny McCord his constitutional and statutory rights. After more than two years of extensive discovery, the defendants moved for summary judgment. The district court granted this motion, finding that collateral estoppel barred plaintiff's claims, or alternatively, that plaintiff lacked a legal injury for which relief could be granted. Plaintiff McCord appeals that judgment.

II

■ Collateral estoppel "prohibits parties who have litigated one cause of action from relitigating in a second and different cause of action matters of fact which were, or necessarily must have been, determined in the first litigation." *Tutt v. Doby*, 459 F.2d 1195, 1197 (D.C.Cir. 1972). *See Nasem v. Brown*, 595 F.2d 801, 805 (D.C.Cir. 1979); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, April 15, 1977). Like res judicata, collateral estoppel promotes judicial efficiency. As the Supreme Court has noted,

---

[*] Circuit Judge Leventhal, who was a member of this panel when the case was heard, died before the panel had agreed on a disposition. Circuit Judge Tamm was drawn by lot to replace Judge Leventhal in the consideration of this appeal.

[**] Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

a party who has had one fair and full opportunity to prove a claim and has failed in that effort should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.

*Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 324–25, 91 S.Ct. 1434, 1440, 28 L.Ed.2d 788 (1971) (quoting *Bruszewski v. United States*, 181 F.2d 419, 421 (3d Cir.), *cert. denied*, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950)). For this doctrine to apply, the same issue must be at stake in both cases, and the issue must have been litigated and decided in the first suit.[1]

McCord's allegations in this case encompass in all material respects the same claims he presented in his coram nobis petition and his criminal conviction appeal. These claims center on ineffective assistance and intentional betrayal. Though in his civil case he couches his claims primarily in tort, he raises no new material contentions.[2]

■ Furthermore, the legal standards for ineffective assistance of counsel in McCord's criminal proceedings and for legal malpractice in this action are equivalent. At the time of McCord's criminal appeal, this court defined ineffective assistance of counsel as the denial of a defendant's entitlement "to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." *United States v. DeCoster (DeCoster I)*, 487 F.2d 1197, 1202 (D.C.Cir. 1973). The concept of reasonable competence is also the standard "traditionally and universally employed as the measure of the lawyer's civil liability . . . ." *United States v. DeCoster (DeCoster III)*, 624 F.2d 196 at 249 (D.C.Cir. 1979) (Robinson, J., concurring), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). *See Marzullo v. Maryland*, 561 F.2d 540, 544 & n.9 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978); Gard, *Ineffective Assistance of Counsel—Standards and Remedies*, 41 Mo.L.Rev. 483, 495–96 (1976). *See also McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); Restatement (Second) of Torts § 299A (1965); Bines, *Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus*, 59 Va.L.Rev. 927, 937 (1973).

Given the similarity of both the facts in issue in this case and the applicable legal standards, estoppel may be considered if

1. Because it is the defendants who raise collateral estoppel to bar the plaintiff's relitigation of the malpractice issues, we need not be concerned that the defendants were neither parties nor privies to the criminal trial or appeal. In *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971), the Court held that "defensive use" of a prior judgment—that is, a defendant's assertion of collateral estoppel to prevent a plaintiff's litigation of issues the plaintiff previously litigated and lost—was permissible even though the defendant was not himself bound by the prior judgment. Last year the Court reaffirmed this rule. *See Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Distinguishing defensive use from offensive use (a *plaintiff's* assertion of collateral estoppel to prevent a *defendant's* litigation of issues the defendant previously litigated and lost), the *Parklane* Court observed that even if the defendant was not himself subject to an estoppel arising from the prior judgment he asserts against the plaintiff, defensive use promotes judicial economy without being unfair. *See id.* at 329–31, 99 S.Ct. at 650–51.

2. When asked during oral argument to identify any issues of fact concerning his defense attorney's performance that had not been raised during the criminal proceedings, McCord's counsel responded only: "The overlooking, and we maintain and there's evidence, the intentional suppressing of that [official authorization] defense as a defense for McCord in the trial of the case." This issue was in fact argued in the coram nobis proceeding, *see, e. g.,* Supplemental Memorandum of the United States in Opposition to Motion by Defendant McCord in the Nature of a Writ of Coram Nobis at 4 & n.5, *United States v. McCord*, Crim. No. 1827–72 (D.D.C. Sept. 18, 1973), and in the criminal appeal, *see United States v. McCord*, 509 F.2d 334, 353 n. 69 (D.C.Cir. 1974) (en banc), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

these issues were actually litigated in McCord's criminal proceedings.[3] McCord asserts that they were not. He claims that a proper evidentiary hearing did not take place during consideration of the coram nobis petition or on appeal, thus denying him the opportunity to develop the facts of his case fully. We disagree.

A hearing need not be held for collateral estoppel to apply. When the facts are undisputed or accepted as true, a hearing would serve no purpose. Disposition by summary judgment will suffice, for example, because "there is no issue of material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). *See Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 110, 115–16 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). In McCord's criminal appeal we accepted all of McCord's factual assertions as true, but still rejected his contentions. *See United States v. McCord*, 509 F.2d 334, 352 nn. 65–66 (D.C.Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). Having accepted McCord's factual assertions, a hearing now would amount to little more than a "useless ritual." *Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d at 115.

Estoppel is not inappropriate because a contested issue is first raised after trial. McCord first asserted his ineffective assistance of counsel claim in his motion for a writ of error coram nobis. *See* Supplemental Memorandum on Points and Authorities in Support of Motion in the Nature of a Writ of Error Coram Nobis at 2, *United*

*States v. McCord*, Crim. No. 1827–72 (D.D.C. Aug. 9, 1973).[4] Judge Sirica denied the motion after considering the parties' memoranda and arguments. *United States v. McCord*, Crim. No. 1827–72 (D.D.C. Nov. 7, 1973) (order denying writ of error coram nobis). On appeal, the parties fully briefed the issue, and it received a full discussion from this court. *See United States v. McCord*, 509 F.2d at 351–53. Thus McCord has already litigated the issue twice and lost, *see Rosenberg v. Martin*, 478 F.2d 520, 565 (2d Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973), making defensive invocation of collateral estoppel appropriate, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–31, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971).[5]

Moreover, the circumstances of this case particularly favor invocation of collateral estoppel. McCord had every incentive in his criminal proceedings to argue aggressively for his claim of ineffective assistance of counsel. As noted above, he had a full and fair opportunity to prove his case. Precluding reconsideration of a litigated claim saves valuable judicial time and resources, while reaffirming the certainty and stability of judicial decisions. *See Johnson v. United States*, 576 F.2d 606, 609–19 (5th Cir. 1978). Furthermore, estoppel saves Bailey, Alch, and their former law firm from the burden of defending a lawsuit on an issue that has already been fully adjudicated. *See Parklane Hosiery v. Shore*, 439 U.S. at 326–27, 99 S.Ct. at 649; *Tutt v. Doby*, 459 F.2d 1195, 1199 (D.C.Cir. 1972).

---

**3.** McCord does not contest that litigation of an issue in a criminal proceeding can estop a party from raising the same claim in a subsequent civil action. *See Emich Motor Corp. v. General Motors Corp.*, 340 U.S. 558, 568–69, 71 S.Ct. 408, 413–14, 95 L.Ed. 534 (1951); *McNally v. Pulitzer Pub. Co.*, 532 F.2d 69, 76 (8th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976). This "rule is not changed by the fact that the [civil] action is brought by the person convicted in the prior criminal action ...." *Willard v. United States*, 422 F.2d 810, 812 (5th Cir.), *cert. denied*, 398 U.S. 913,

90 S.Ct. 1714, 26 L.Ed.2d 76 (1970). *See Cardillo v. Zyla*, 486 F.2d 473 (1st Cir. 1973); *United States v. Lima*, No. 79–502, slip op. at 4 (D.C.App. Mar. 12, 1980); *Ross v. Lawson*, 395 A.2d 54 (D.C.App.1978).

**4.** The court in *McCord* apparently believed the issue had not been raised before the district court. *See United States v. McCord*, 509 F.2d at 351 n.61.

**5.** *See* note 1 *supra*.

In sum, plaintiff McCord seeks to relitigate issues concerning the quality of his criminal trial counsel that he raised in the course of the criminal proceedings. Having twice raised these issues and lost, McCord cannot raise the claims anew in a civil case.

### III

The district court also found that McCord had failed to prove that defendants' alleged misdeeds caused him any actual injury. McCord's only claim of loss from his counsel's negligence, however, is McCord's belief that Alch failed to assert defenses that would have exonerated him. We agree with the district court that this claim is not sufficient to support a suit for legal malpractice.

As a plaintiff in a malpractice suit,[6] McCord must demonstrate that the defendants' actions caused a legally cognizable injury. *Becker v. Colonial Parking, Inc.*, 409 F.2d 1130, 1136–37 (D.C.Cir. 1969); *Richardson v. Gregory*, 281 F.2d 626, 629 (D.C.Cir. 1960). The plaintiff must show, among other things, that his attorney's "negligence resulted in and was the proximate cause of loss to the client." *Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949). Thus an attorney is not liable for malpractice if his client has suffered no damages.

McCord's sole assertion of injury proximately caused by his counsels' malpractice is that Alch negligently failed to argue a defense of "official authorization" for the Watergate operation and thereby denied McCord a successful defense. McCord claims he participated in the break–in and bugging because he believed that the Attorney General of the United States had authorized and approved the activity and that in so doing the Attorney General had made lawful what would otherwise have been unlawful behavior. McCord further asserts that he told defendant Alch about his belief that he had been officially authorized, and that Alch either negligently or maliciously failed to present the defense to the court. Such a defense, McCord contends, could have led to his acquittal.

A division of this court has suggested by way of a per curiam reversal that a limited defense to a criminal charge exists for reasonable, good faith reliance on the apparent authority of a government official to authorize otherwise unlawful activity. *United States v. Barker*, 546 F.2d 940 (D.C.Cir. 1976) (per curiam). Writing in a separate opinion, Judge Wilkey stated that a defendant asserting this defense must "show that his reliance was *objectively reasonable* under the particular circumstances of his case." *Id.* at 949 (Wilkey, J.) (separate opinion) (original emphasis). Judge Merhige agreed that the defense was available "if, and only if, an individual (1) *reasonably, on the basis of an objective standard*, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration and/or enforcement responsibilities in the relevant

---

**6.** Count 3 of plaintiff's amended complaint alleges that the defendants took part in a conspiracy to deprive McCord of proper representation. However, civil conspiracy is not in and of itself a civil wrong, giving an independent cause of action. *Lamont v. Haig*, 590 F.2d 1124, 1136 n. 73 (D.C.Cir. 1978). *See Edwards v. James Stewart & Co.*, 160 F.2d 935, 936–37 (D.C.Cir. 1947); *Blankenship v. Boyle*, 329 F.Supp. 1089, 1099 (D.D.C. 1971). *But see also* Note, *Civil Conspiracy: A Substantive Tort?*, 59 Bost.U.L.Rev. 921, 926 (1979) (separate cause of action for civil conspiracy permitted in a few jurisdictions under limited circumstances).

We have studied plaintiff's complaint closely, but we are unable to discern that he pleads or intimates any cause of action other than legal malpractice and deprival of civil rights. *Cf.*

*Fielding v. Brebbia*, 399 F.2d 1003, 1004 (D.C. Cir. 1968) (complaint alleged attorney had committed a breach of fiduciary duty). We are not free to fabricate pleadings for either party. As McCord himself reminds us,

> [w]e must predicate our judgment upon the record as it comes to us, not upon some theoretical or philosophical idea of what the record might have been had the pleadings and the record in the trial court presented us with a wide latitude for study and a multiple selection of possible dispositions. Upon the present record we have more voice than power.

Brief for Appellant at 34 (quoting *Pearson v. Dodd*, 410 F.2d 701, 709 (D.C.Cir.) (Tamm, J., concurring), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969)).

legal field." *Id.* at 955 (Merhige, J.) (separate opinion) (emphasis added).[7]

Even if we assume that after *Barker* a criminal act will be excused if the defendant was misled by a government official into believing that the act was lawful, McCord cannot make a colorable argument under either Judge Wilkey's or Judge Merhige's formulation. Clearly McCord must show that he had *some* objective basis to believe the Watergate operation enjoyed official sanction. Such a showing is unimaginable. McCord's employer was not a government agency, but a political committee. McCord did not believe his supervisor, Gordon Liddy, was other than a private individual. McCord had no direct contact with any government official, nor did he have reason to believe Liddy functioned as an intermediary for anyone acting in an official capacity. McCord conceded before the Senate Watergate Committee that his bugging and surveillance all concerned political activities and that McCord himself harbored suspicions that the operations were unrelated to national security or other

legitimate government interest.[8] Thus to the extent there is an official authorization defense, it could not apply to McCord. *See Democratic National Committee v. McCord*, 416 F.Supp. 505, 508–09 (D.D.C.1976). Accordingly, had Alch or Bailey raised the defense at McCord's trial, Judge Sirica would have stricken it on its face; there could have been no difference in the trial's outcome.

McCord has failed to indicate how he could successfully establish injury, an essential element of his claim, and the defendants were entitled to judgment as a matter of law on this issue. The district court did not err when it identified the absence of any legally cognizable harm as an alternative basis for granting summary judgment.

## IV

 In the fourth and final count of his amended complaint, plaintiff McCord asserts claims against the defendants under 42 U.S.C. §§ 1983, 1985(2), (3) (Supp. II 1978).[9] The district court did not discuss

---

**7.** Judge Leventhal dissented in *Barker* because he did not believe *any* mistake of law defense actually applied to the Watergate circumstances. *See United States v. Barker*, 546 F.2d 940, 957–73 (D.C.Cir. 1976) (Leventhal, J., dissenting).

**8.** *See Hearings on Watergate and Related Activities Before the Senate Select Comm. on Presidential Campaign Activities*, 93d Cong., 1st Sess., pt. 1, at 166 (1973). Judge Bazelon, speaking for this circuit in affirming McCord's criminal conviction, concluded that

[McCord's] testimony before the Watergate Committee and the newly discovered evidence discussed in the text both tend to support the conclusion that McCord at no time believed his authorization was based on considerations of the domestic security of the United States, *see* Hearings on Watergate and Related Activities Before the Senate Select Comm. on Presidential Campaign Activities, 93d Cong., 1st Sess., pt. 1, at 127–28, 173–76, 203 (1973) . . .; Trial Tr. at 1031. In light of this factual confusion and the problematic legality of McCord's defense, we find no plain error in the failure to raise the defense *sua sponte*.

*United States v. McCord*, 509 F.2d 334, 343 n. 18 (D.C.Cir. 1974) (en banc), *cert. denied*, 421 U.S. 940, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

**9.** Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1976). In 1979, Congress expanded the coverage of § 1983 to include acts under color of District of Columbia law. Pub.L.No. 96–170, § 1, 93 Stat. 1284 (1979). This amendment has no bearing upon McCord's case, however, because McCord does not contend that any deprivation of his rights occurred after the effective date of the amendment, December 29, 1979. *See id.* § 3.

Section 1985, subsections (2) and (3), provides that:

(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified . . .; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeat-

these allegations. Findings of fact and conclusions of law must be "sufficiently comprehensive and pertinent to the issues to provide a basis for decision." *Schilling v. Schwitzer–Cummins Co.*, 142 F.2d 82, 84 (D.C.Cir. 1944). *See Kelley v. Everglades Drainage District*, 319 U.S. 415, 420–22, 63 S.Ct. 1141, 1144–45, 87 L.Ed.2d 1485 (1943) (per curiam). Although inadequate findings and conclusions may be remanded to the district court for supplementation, "we will not remand a case for more specific findings if doing so will consume precious time and judicial resources without serving any purpose." *LaSalle Extension University v. FTC*, 627 F.2d 481, 485 (D.C. Cir. 1980) (per curiam). We therefore must examine each of McCord's civil rights contentions to determine whether further consideration by the district court is required.

**A.** *McCord's Causes of Action Under Sections 1983, 1985(3), and the Second Clause of 1985(2)*

 ▮ To maintain a cause of action under section 1983, McCord must show that the defendants deprived him of his civil rights "under color of state law." *Griffin v. Breckenridge*, 403 U.S. 88, 99, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). On this record McCord could not make the required showing. The defendants appeared on McCord's behalf at his criminal trial. Lawyers may be officers of the court, but " 'they are not officers of the state within the meaning of [section 1983].' " *French v. Corrigan*, 432 F.2d 1211, 1215 (7th Cir. 1970) (quoting *Jones v. Jones*, 410 F.2d 365, 366 (7th Cir. 1969), *cert. denied*, 396 U.S. 1013, 90 S.Ct. 547, 24 L.Ed.2d 505 (1970)), *cert. denied*, 401 U.S. 915, 91 S.Ct. 890, 27 L.Ed.2d 814 (1971). *Accord, Brown v. Chaffee*, 612 F.2d 497, 501

(10th Cir. 1979). In their capacities as representatives of a client in court, private counsel do not act under color of state law. *Slavin v. Curry*, 574 F.2d 1256, 1265 (5th Cir. 1978); *Fine v. City of New York*, 529 F.2d 70, 74 (2d Cir. 1975).

McCord argues, however, that the defendants are subject to section 1983 by virtue of their alleged conspiracy with various federal officials. Even if McCord's factual allegations are correct, such a conspiracy fails to satisfy section 1983's requirements. As the Supreme Court stated in *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), section 1983 "deals only with those deprivations of rights that are accomplished under the color of the law of 'any State or Territory.' " *Id.* at 424, 93 S.Ct. at 606. Actions of federal officers are outside its proscriptions. *See id.* at 424–25, 93 S.Ct. at 606.

 ▮ McCord's claim under 42 U.S.C. § 1985(3) is equally without merit. In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1970), the Court held that although section 1985 reaches private conspiracies as well as those involving state action, the language, legislative history, and constitutional basis of the statute indicate that a plaintiff under section 1985(3) must allege and prove "some racial, or perhaps otherwise class–based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 102, 91 S.Ct. at 1798. *Accord, e. g., Ellis v. Cassidy*, 625 F.2d 227 at 229 (9th Cir. 1980). Plaintiff McCord cannot pretend that he was the object ˌof civil rights deprivation because of his race or membership in some other class.

McCord also asserts that the defendants conspired with others to dissuade him from testifying in his own behalf before the

ing, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy,

whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(2), (3) (Supp. II 1978).

Our discussion of injury, *see* part III *supra*, is not applicable here.

grand jury and at his trial, thereby giving rise to a cause of action under 42 U.S.C. § 1985(2).[10] The second half of section 1985(2) does not apply to McCord. Like section 1985(3), it specifies an intent to deny equal protection of the laws and draws its constitutional basis from section 5 of the fourteenth amendment, which gives Congress the power to legislate against obstructions of justice in a state. Such a construction avoids any question of Congress's authority to enact this provision. *See, e. g., Brawer v. Horowitz,* 535 F.2d 830, 839–40 (3d Cir. 1976).

### B. *McCord's Cause of Action Under the First Clause of Section 1985(2)*

The requirement of discriminatory animus in actions under the first half of section 1985(2) presents a question of first impression in this circuit.[11] Like the Third Circuit, "[w]e approach the perfidious syntax of § 1985(2) with some reserve for . . . there is a dearth of authority to light our way." *Brawer v. Horowitz,* 535 F.2d at 837.

We begin with the language of the statute itself. *See, e. g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Zerilli v. The Evening News Association,* 628 F.2d 217, 220 (D.C.Cir. 1980). The first clause of section 1985(2) creates a cause of action

> [i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or wit-

ness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified . . . ;

42 U.S.C. § 1985(2) (Supp. II 1978). Thus the first clause, unlike its companion provisions, prohibits conspiracies to interfere with the integrity of the federal judicial system. It does not demand a denial of "equal protection of the laws," nor is an implication of such a requirement necessary to avoid constitutional shoals.[12]

According to the Supreme Court, the Reconstruction civil rights acts are to be "accord[ed] a sweep as broad as [their] language." *Jones v. Alfred H. Mayer,* 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968) (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)). *Accord, Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 1795, 29 L.Ed.2d 338 (1971). Given the manifest meaning and the absence of reason for restrictive reading, we do not believe a class–based, invidiously discriminatory intent is an element of a cause of action under the first clause of section 1985(2). *See, e. g., Brawer v. Horowitz,* 535 F.2d at 840. Our instructions are clear: "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are

---

**10.** *See* note 9 *supra.*

**11.** Decisions in other circuits have reached differing conclusions. *Compare, e. g., Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir. 1976) (showing of discriminatory animus not required) *and Kelly v. Foreman,* 384 F.Supp. 1352, 1355 (S.D.Tex.1974) (same) *with Jones v. United States,* 401 F.Supp. 168, 172–74 (E.D. Ark.1975) (plaintiff must show class–based, invidiously discriminatory intent), *aff'd,* 536 F.2d 269, 271 (8th Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 750 (1977).

**12.** The constitutional basis for the first clause of § 1985(2) is Congress's plenary power over the federal courts. The Constitution grants Congress power "[t]o constitute Tribunals inferior to the supreme Court," U.S.Const., art. I, § 8, cl. 9, and Congress enjoys wide latitude in effectuating its constitutional powers, *see*

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Preserving the integrity of the federal judicial process clearly includes discouraging all conspiracies, whatever their motivation or target, that use threats, force, or intimidation to deter free, full, and truthful testimony. *See Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1341 n.19 (7th Cir.) (dictum), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *Brawer v. Horowitz,* 535 F.2d at 840; *Kelly v. Foreman,* 384 F.Supp. at 1355. Congress lacked an equivalent authority over state courts, so the equal protection language in the second half of § 1985(2) was inserted to ground that portion of the statute on Congress's power under § 5 of the fourteenth amendment. *See* pages 615–617 *infra.*

to aid doubtful meanings need no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

█ Even if we were obligated to look beyond the face of the statute, as the defendants suggest, we would find that the legislative history supports our conclusion. Reinforcing the sanctity of the federal judicial process for *all* citizens was one objective Congress had in mind when it enacted the source of section 1985, the Ku Klux Klan Act of 1871, Act of Apr. 20, 1871, 17 Stat. 13. *See* page 615 *infra*. Moreover, the draftsman of the original legislation added the "denial of equal protection of the laws" phrase to his bill solely to allay doubts about the section's constitutionality that were raised by the bill's opponents. Because the bill's friends and foes acknowledged the federal government's power to protect its own courts, this phrase was not attached to the language that is now the first clause of section 1985(2). *See* pages 615–617 *infra*.

Protection of civil rights was not the only reason for the enactment of the Ku Klux Klan Act of 1871. Restoration of civil authority, including restoration of the federal courts' ability to proceed without improper interference, was a major concern. The statute has its roots in the racial violence that erupted in the southern states at the end of the Civil War. The Ku Klux Klan had been organized in 1866. The subsequent five years had been marked by increasing numbers of attacks, often fatal, against blacks and Union sympathizers, including many federal officials. By 1871, the turbulence in the South had caused considerable consternation in Congress. On March 23, 1871, President Grant asked for legislation giving him additional authority to control the apparent chaos. Five days later, Representative Samuel Shellabarger of Ohio introduced a bill to meet the President's request. *See generally District of Columbia v. Carter*, 409 U.S. 418, 425–26, 93 S.Ct. 602, 606–607, 34 L.Ed.2d 613 (1973).

Throughout the deliberations that followed in the House and Senate, a recurring theme was that the need to preserve orderly government mandated enactment of Representative Shellabarger's bill. President Grant's message had declared that "[a] condition of affairs now exists in some States of the Union rendering ... the carrying of the mails and the collection of the revenue dangerous." Cong.Globe, 42d Cong., 1st Sess. 244 (1871). Proponents of Shellabarger's bill repeatedly raised the specter of a renewed spirit of insurrection running rife in the South. Representative Buckley, for example, warned the House of Representatives that this spirit

> still defies the national authority, sets at naught the laws of the country, and tramples upon the natural and political rights of our fellow citizens. The United States mails are stopped; route agents are shot dead while assorting the mails, and others are driven from their routes.
>
> Your revenue officers are resisted and scourged and driven from their homes and families and out of the country.... In certain communities lawlessness is widespread and on the increase. Crimes are fearfully common. The value of human life is disregarded. Murderers go unpunished.... Terrorism reigns. The apprehension of violence prevents good men from arresting the evils they see.

*Id.* at app. 190. *See id.* at 519 (remarks of Rep. Shellabarger). Thus congressional concerns encompassed more than racial equality or personal rights. The operation of government, especially the federal government, was threatened. Civil survival was at stake. *See, e. g., id.* at 830 (remarks of Sen. Stewart). To prevent what appeared to be impending anarchy, Congress must have intended its measure to reach more than attacks on government operations to further racial or other invidious discrimination, at least to the extent the Constitution permitted Congress to act.

Indeed, the bill as originally proposed created a broad remedy to address Congress's broad concerns. Section 2 of the bill would have made it a federal felony to conspire with another to commit, among other crimes, perjury, subornation of perjury, or criminal obstruction of justice, regardless of whether the offense took place in the course of state or federal proceedings. *Id.* at 317

(remarks of Rep. Shellabarger).[13] Opponents of this version characterized the provision as an unconstitutional trampling upon state prerogatives. Representative Arthur of Kentucky complained that the section "absorbs the entire jurisdiction of the States over their local and domestic affairs" and called it "a sweeping usurpation of universal criminal jurisdiction in the States." *Id.* at 366. Representative Whitthorne of Tennessee argued that the section effectively empowered Congress to oversee all of the states' functions. *Id.* at 337.

Representative Shellabarger amended his bill in response to these objections that Congress lacked constitutional authority to extend federal jurisdiction as proposed in section 2.[14] The new version stated with greater specificity the violations brought under federal jurisdiction. For offenses traditionally left to state jurisdiction, such as obstruction of justice in state courts, the purview of section 2 was limited to crimes committed with an intent to deprive equal protection of the laws; as a result, the revised section 2 confined the new federal cause of action to violations of an explicit federal interest. For offenses under federal jurisdiction regardless of the offender's intent, such as acts interfering with the operation of federal courts, no limitation was made.

The changes answered the objections of some members. For example, Representative Willard explained that he had believed the original bill "gave to the United States

---

**13.** In its original form, § 2 of Representative Shellabarger's bill provided that

if two or more persons shall, within the limits of any State, band, conspire, or combine together to do any act in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and laws of the United States, which, committed within a place under the sole and exclusive jurisdiction of the United States, would, under any law of the United States then in force, constitute the crime of either murder, manslaughter, mayhem, robbery, assault and battery, *perjury, subornation of perjury, criminal obstruction of legal [ ] process* or resistance of officers in discharge of official duty, arson, or larceny, and if one or more of the parties to said conspiracy or combination shall do any act to effect the object thereof, all the parties to or engaged in said conspiracy or combination, whether principals or accessories, shall be deemed guilty of a felony, and upon conviction thereof shall be liable to a penalty of not exceeding $10,000, or to imprisonment not exceeding ten years, or both, at the discretion of the court; provided, that if any party or parties to such conspiracy or combination shall, in furtherance of such common design, commit the crime of murder, such party or parties so guilty shall, upon conviction thereof, suffer death....

Cong.Globe, 42d Cong., 1st Sess. 317 (1871) (remarks of Rep. Shellabarger) (emphasis added). *See id.* at app. 188 (remarks of Rep. Willard).

**14.** The amendment, among other things, replaced § 2 of the bill with the following provision:

Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire ... by force, intimidation, or

threat to deter any witness in any court of the United States from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such witness in his person or property on account of his having so testified, or by force, intimidation, or threat to influence the verdict of any juror in any court of the United States, or to injure such person in his person or property on account of any verdict lawfully assented to by him, or shall conspire together for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, each and every person so offending shall be deemed guilty of a high crime ... and if any one or more persons engaged in such conspiracy, such as is defined in the preceding section, shall do or cause to be done any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages against any one or more of the persons engaged in such conspiracy....

*Id.* at 477 (remarks of Rep. Shellabarger). *See* note 9 *supra.*

courts jurisdiction of every criminal offense that could be committed anywhere within the limits of the United States; that it practically abolished the criminal jurisdiction of the State, absorbing it all into the United States courts." *Id.* at app. 188. With the amendment's restriction of federal jurisdiction over state crimes to violations that were intended to deny equal protection of the laws, Representative Willard announced he would vote in favor of the measure. *See id.* (remarks of Rep. Willard). Even those who continued their opposition conceded that Congress could do as it wished to protect the federal judiciary. Senator Thurman told the Senate:

> I grant that as to those which are offenses against the United States they must be taken into the Federal courts; the State courts have no jurisdiction of them. For instance, to intimidate a witness so as to prevent his attending a Federal court, to tamper with a juror in a Federal court, are offenses, not against the State, but offenses against the jurisdiction of which must be given to the Federal courts . . . .

*Id.* at app. 220.

Thus for the purpose of defusing the objections that his bill asserted federal juris-

diction over state crimes in excess of Congress's constitutional powers, Representative Shellabarger added the requirement of an intent to deny equal protection of the laws. Inserting the equal protection language limited federal jurisdiction over state crimes to those offenses that also injured a federal interest grounded in the fourteenth amendment. No such limitations were required in the bill with regard to protection of the federal interest in its own judicial process. Federal jurisdiction in all cases of this nature, such as intimidation of a witness in a federal proceeding, was recognized by both the bill's supporters and its opponents. Neither injury to a federal interest nor federal authority to remedy that injury were in doubt. Consequently, in applying the portion of Shellabarger's revised section 2 that is now codified as the first clause of 42 U.S.C. § 1985(2), the legislative history does not support requiring proof of a racial or other class–based invidious discrimination.[15]

## V

We have concluded that either the application of collateral estoppel or the lack of

---

**15.** By the same token, the clause's requirement that the conspiracy consist of two or more persons "in any State or Territory" does not exclude conspiracies conducted in the District of Columbia. In *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1971), the Court held that the words "State or Territory" as used in 42 U.S.C. § 1983 do not include the District. Nevertheless, the term "State or Territory" may have one meaning in § 1983 and another in § 1985(2). The *Carter* Court recognized that " '[w]here the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning may well vary to meet the purposes of the law . . . .' " 409 U.S. at 421, 93 S.Ct. at 604 (quoting *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932)).

The first clause of § 1985(2) is readily distinguishable from § 1983. In § 1983, "State or Territory" defines whose officials will have liability. In *Carter,* the Court reasoned that Congress did not intend the provision to extend to

District of Columbia officials because Congress already had plenary power over officers of the District, and Congress had ample opportunity to supervise those officials directly. In § 1985(2), however, "State or Territory" defines what conspiracies will be subject to the statute. We cannot presume Congress intended to attack conspiracies throughout the nation *except* for the District of Columbia. A rationale that would justify establishing the District as a conspiracy enclave is difficult to conceive. Furthermore, Congress enacted § 1983 pursuant to its powers under the fourteenth amendment. The *Carter* Court concluded that the District's officers were not liable under § 1983 because the fourteenth amendment reaches only state action. This limitation does not apply where article I powers are employed, such as the enactment of the first clause of § 1985(2) to protect the federal judiciary. *See also Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948) ("State or Territory" includes the District of Columbia for purposes of § 1982 because the statute is based upon the thirteenth amendment and thus is not limited to state action).

any legally cognizable harm to the plaintiff precluded McCord's legal malpractice claims under counts one through three of his complaint. Due to the absence of state action and any intent on the defendants' part to inflict a class-based, invidious discrimination, McCord cannot maintain a cause of action under 42 U.S.C. §§ 1983, 1985(2) (cl. 2), and 1985(3). We hold that with respect to McCord's claim under the first clause of 42 U.S.C. § 1985(2), however, neither a showing of state action nor a showing of class-based, invidious discrimination is required. His claim therefore cannot be discarded because these factors are not present.

On this record we cannot say that McCord's invocation of section 1985(2) is frivolous. The defendants contend that McCord did not allege with sufficient particularity the overt acts of a conspiracy and that McCord did not offer proof of having been threatened or intimidated not to testify before the grand jury or at his trial. These issues are principally factual; they are best resolved in the first instance by the court that has been most intimately connected with the record. The decision of the district court is therefore reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

WALD, Circuit Judge, concurring in part, dissenting in part:

I concur in Parts I, III and IV of Judge Tamm's opinion for the court. I disagree only with footnote 6 and with the discussion in Part II of the applicability of the doctrine of collateral estoppel in the unusual circumstances of this case.

While I agree with Part III of the opinion, the impossibility of McCord's demonstrating injury only disposes of one potential cause of action based on the facts alleged in his complaint, that of malpractice based on negligence. I cannot concur in the conclusion expressed in the majority's footnote 6 that McCord's complaint is so limited. It does not require an indulgent reading of the complaint to draw from McCord's allegations something more than mere negligence, though much of the language is cast in that light. McCord specifically alleges that his lawyers "knowingly and intentionally failed ... to inform [him] of pertinent facts and factors," "failed to pursue certain avenues of investigation of matters vital to [his] defense," and that "at all relevant times hereto, the interests of the Defendants were in unrevealed conflict with the interests of the Plaintiff [McCord]." Furthermore, in Count II, he charges that the acts arose out of a conspiracy with the chief Watergate co-conspirators. A claim of disloyalty or conflict of interest on the part of an attorney is an actionable tort, recognized in our Circuit,[1] and described in the Restatement (Second) of Torts § 874 as a "breach of fiduciary duty." McCord's allegations of disloyalty, if proved, constitute a legally cognizable "wrong" separate and apart from the adequacy of his representation at trial.[2]

---

1. In *Fielding v. Brebbia*, 399 F.2d 1003 (D.C.Cir. 1968), the plaintiff sued his attorney for breach of the fiduciary relationship, alleging that the attorney had counseled him to resign his position as president of a corporation, in order to help another client replace him and take over the business. In spite of the fact that in its factual allegations supporting the claim the complaint was conclusory and vague in the extreme, this court held that its dismissal for failure to state a claim was improper, noting that "this jurisdiction has been outstandingly alert to the delicacy of the status of attorneys who undertake to counsel a client." *Id.* at 1005. The court further justified its hesitancy to bar the plaintiff from his opportunity to prove his claim by noting that the confidential

relationship "presents so many opportunities for the reaping of special benefits at the expense of the client by an attorney so disposed." *Id.*

2. The right to the undivided loyalty of one's attorney is "absolute" in the sense that it does not depend on one's guilt or innocence. That duty of loyalty is a crucial factor in the success of our adversary system of justice. It is strongly stated in Ethical Consideration 5–1 of the ABA Code of Professional Responsibility:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of

Furthermore, I would conclude that an allegation of deliberate and willful disloyalty and conflict of interest states a claim without an allegation of actual damages; the cause of action vindicates a legal *wrong* rather than seeking to compensate injury.[3] Of course, even assuming that on a generous reading McCord's complaint alleges a tort claim which is not predicated on harm, collateral estoppel would serve as a barrier, according to the majority's discussion of that doctrine in Part II. I cannot agree with that conclusion, given the facts of this case.

The doctrine of collateral estoppel, reduced to its essence, provides that our judicial system will provide a party with only one "full and fair opportunity" to litigate an issue. "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).

I agree with the majority that it may be perfectly acceptable for a party to be held bound by a determination made in a prior criminal proceeding in which he or she was the defendant. And of course, the fact that an issue is settled in the course of a summary proceeding, without an evidentiary hearing, does not necessarily mean that estoppel cannot apply, so long as a final judgment was entered on the merits. Many cases recognize the collateral estoppel effect of a final judgment based on insufficiency of a complaint or on summary judgment.

Nevertheless, I have difficulty with holding McCord totally estopped from asserting all claims of disloyalty and conflict of interest under the circumstances of this case. And I note other courts have had similar difficulties when faced with occasional unfair results which might be wrought by too broad an application of the doctrine of collateral estoppel. Some have gone so far as to describe the doctrine as dangerous, in that it could result in "utter disaster" as a result of a "trivial controversy," subjecting litigants to "extravagant hazards." *The Evergreens v. Nunan*, 141 F.2d 927, 929 (2d Cir.), *cert. denied*, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944) (Learned Hand, J.). Traditionally, courts relied on a variety of approaches to avoid the necessity of holding a litigant bound when to do so would be unfair or unwise under the circumstances.[4]

---

other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.
Of particular relevance to this case is Disciplinary Rule 5–107(B):
A lawyer shall not permit a person who ... pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

**3.** The Supreme Court has recently observed:
Common–law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978).

**4.** For example, some decisions define the "issue" determined in the prior proceeding very narrowly, and then conclude that the new issue is different, albeit only slightly. *See Brubaker v. King*, 505 F.2d 534 (7th Cir. 1974); *Williams v. Liberty*, 461 F.2d 325 (7th Cir. 1972). Other courts have held that if the prior determination decided more than was "necessary," the bar should not apply. *Haize v. Hanover Ins. Co.*, 536 F.2d 576 (3d Cir. 1976). Still other courts have strictly applied the requirement that a question be "distinctly put in issue and directly determined," especially in cases involving prior criminal proceedings. *Kauffman v. Moss*, 420 F.2d 1270 (3d Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970).
Any of these theories could support a refusal to conclude that McCord is collaterally barred here. The issue in our prior decision was, after all, whether the assistance provided by McCord's counsel was so ineffective as to impair his right to a fair trial. Here, on the other hand, the question is whether Bailey and Alch

These analyses led to a conclusion that collateral estoppel could *not* apply because its prerequisites had not been met. I do not believe that such a restrictive ruling is necessary here, however. A more straightforward and flexible analysis has recently been commended to us by the Supreme Court. *Parklane Hosiery, supra*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552, struck down the last vestiges of mutuality of estoppel, which had provided that neither party could use a prior judgment against the other party unless both parties were bound by the same judgment. The Court recognized, however, that as traditional restrictions on the use of collateral estoppel were eased, the possibility of unfairness increased. I would add that the possibility of the frustration of the important public benefit of having issues fully aired and finally decided also increases. The solution, declared the Court, was not to impose strict limitations on when collateral estoppel may apply, but to grant broad discretion to determine that it should *not* apply in a particular case. *Id.* at 331, 99 S.Ct. at 651.

I therefore turn to the question of whether an unusual combination of circumstances in this case might justify providing James McCord with an opportunity to prove that he is entitled to recover damages for malpractice from his former attorneys. There are a variety of such circumstances in this case. First of all, there is the important factor that this case involves the sensitive yet critically important relationship between a criminal defendant and his attorneys. Ensuring the strictest integrity in discharging this trust is a matter of as much concern to this court as it is to defendants. Furthermore, no finder of fact has ever considered the evidence, heard the testimony and cross–examination of witnesses, judged the credibility of witnesses, and concluded that Gerald Alch and F. Lee Bailey were representing McCord with undivided loyalty and protecting his interests alone. In the interests of the courts' duty to supervise the practice of law in this jurisdiction, it would be wise that such a determination be made before this chapter of the Watergate conspiracy is finally closed.

Furthermore, one of the principal purposes of collateral estoppel, "to protect litigants from the burden of relitigating an identical issue with the same party," *Parklane Hosiery, supra*, at 326, 99 S.Ct. at 649, is not a factor in this case. Alch and Bailey have never previously been party to any suit brought by McCord; calling them to answer in a judicial forum for the first time works no more of an injustice against them than a lawsuit may against any litigant.[5] Mutuality may not be a *requirement* of collateral estoppel any more, but lack of mutuality certainly eliminates much of the potential unfairness of deciding not to apply the doctrine.

When preventing unfairness to litigants is not a factor in deciding whether collateral estoppel should apply, we are left with the goal of conserving judicial resources. In such a case, the court's discretion to decide that the benefits of an evidentiary hearing to finally resolve this issue are greater than the detriment to its resources is appropriately broader. This case should not involve the "staggering expense and typical length" of a patent case, for example, where collateral estoppel is particularly valuable. *Id.* at 328–329 n. 10, 99 S.Ct. at 650.

Finally, and particularly noted by the Supreme Court in *Parklane Hosiery* as a fac-

violated the fiduciary duty owed to their client; the effect of that alleged breach on McCord's conviction or on the fairness of his trial is no longer the issue. As the Seventh Circuit has noted, "[T]he standard of proof in a malpractice action might not be as strenuous as it is when questioning the constitutional adequacy of counsel." *Walker v. Kruse*, 484 F.2d 802 (7th Cir. 1973). It could be argued that this court's conclusion on appeal that McCord's allegations "taken as true do not make a case for disloyalty or conflict of interest" was more broadly worded than it need have been to dispose of the case, since all the court needed to decide was whether McCord had alleged a "substantial" deprivation of his right to effective assistance of counsel, which in turn affected his right to a fair trial.

5. In fact, because of the court's ruling on the civil rights issues in this case, the defendants will in fact be called to defend their conduct in this case.

tor to be considered in exercising discretion to decide whether collateral estoppel should apply, there were practical and procedural disadvantages suffered by McCord in presenting his claims to this court before. He was "unable to engage in full–scale discovery or call witnesses," *id.* at 331, 99 S.Ct. at 651, and indeed he alleges that some witnesses were unwilling to talk with him because they were still subject to criminal prosecution. He was also in the process of attempting to pursue his appeal with new counsel, allegedly with a notable lack of cooperation from Alch. All of these are factors which I believe should be considered before the district court decides to foreclose McCord's tort claims, though I would leave initial determination of the balance of equitable considerations to it.[6]

All of this is not to say, of course, that McCord has proved his case of disloyalty and breach of fiduciary duty, even under this limited rationale. Rather, he has presented a plausible sequence of events, supported at key points by uncontested facts and affidavits from third parties, which I believe would give rise to a cause of action for tortious breach of fiduciary duty. Since motive, state of mind and how much of what Alch did was done at McCord's bidding or with his knowledge are critical factors, summary judgment is inappropriate, so long as collateral estoppel does not raise an absolute bar, just as it would be, for instance, in an antitrust or race discrimination case in which the sequence of events alleged by the plaintiff could be either innocent behavior or carefully disguised misconduct. Summary judgment should be used sparingly when motive and intent play a leading role, when proof is likely to be largely in the hands of alleged conspirators, and when a plaintiff is faced with hostile witnesses. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The fact that McCord

may have a difficult time proving his case, however, is not relevant; it is the litigant's choice whether pursuit of an issue difficult to prove and promising only meager relief is justified.

While I am in total agreement with Judge Tamm's able discussion of the underpinnings of a section 1985 action, so that it appears McCord will indeed have his day in court, I would not read his complaint so stringently as to eliminate a potential tort claim. Nor do I believe collateral estoppel is or should be the barrier erected by the majority. I concur therefore in the remand of this case for further proceedings, but would not so circumscribe the scope of those proceedings as has the majority.

---

6. *Parklane Hosiery* establishes that the applicability of the doctrine of collateral estoppel rests within the discretion of the court, taking into account the equitable considerations of a particular case. A reading of the district court's opinion in this case reveals that it believed dismissal to be mandated, once the prerequisites of collateral estoppel are established.

This difference in approach would not require reversal if there were no unique equitable considerations involved in this case, but there are very unusual circumstances involved here which I believe should be considered before further judicial exploration of McCord's claims is foreclosed.