936 A.2d 1036 (2007)
397 N.J. Super. 265
Garvin McKNIGHT, Plaintiff-Appellant,
v.
OFFICE OF the PUBLIC DEFENDER and Kevin Walshe, Esq., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2007.
Decided December 31, 2007.
Kenneth S. Thyne, Totowa, argued the cause for appellant (Roper & Twardowsky, attorneys; Mr. Thyne, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause for respondents (Anne Milgram, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Jordan, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider when a plaintiff's malpractice action against his criminal defense attorney accrues and whetheras held by other jurisdictions the accrual date is impacted by whether a plaintiff is actually innocent of or has been exonerated from the underlying criminal *1037 charges. Because these additional elements tend to produce unpredictable and undesirable results, we reject their inclusion into an accrual standard. However, because the results of post-conviction proceedings may be fatal to or otherwise impact upon the presentation of a criminal malpractice action, we hereafter require that plaintiffs commence at the same time, if they have not already done so, post-conviction proceedings in the criminal matter, and that trial courts freely stay criminal malpractice actions until the underlying criminal proceedings reach their logical conclusion.

I

A
Plaintiff was born in Trinidad and Tobago, and in 1976, when he was five years old, came to live in the United States. On May 24, 2000, he engaged in a dispute with his girlfriend and was indicted. The Public Defender's Office assigned Kevin Walshe, Esq., to represent plaintiff and, based upon Walshe's advice, plaintiff pled guilty on July 26, 2000 to third-degree aggravated assault.
On September 12, 2000, the Immigration and Naturalization Service informed plaintiff that his plea had rendered him deportable. Six days later, on September 18, 2000, plaintiff moved to withdraw his guilty plea. On September 21, 2000, the judge denied the motion, concluding that the effect of a plea on a defendant's immigration status was a collateral consequence, citing State v. Chung, 210 N.J.Super. 427, 510 A.2d 72 (App.Div.1986), and could not support the plaintiff's request for the withdrawal of his guilty plea. Plaintiff was sentenced that same day to a three-year prison term. His appeal was placed on a sentencing calendar, and we affirmed the judgment of conviction on June 5, 2001.
Plaintiff filed a petition for post-conviction relief (PCR) on October 24, 2001. The Public Defender's Office did not assign counsel to represent plaintiff until sometime in 2003. On September 12, 2003, a different judge (the PCR judge) conducted an evidentiary hearing into plaintiff's claim that he had been denied the effective assistance of counsel because Walshe had failed to advise him of the deportation consequences of his plea. At that time, the PCR judge heard testimony from plaintiff, Walshe, and two other attorneys from the Public Defender's Office who had appeared for plaintiff at various stages.
In a written opinion, the PCR judge thoroughly explained what he found had occurred when Walshe completed the plea form on July 26, 2000. Question 17 on the plea form posed the following question: "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" The PCR judge found Walshe responded that the question was inapplicable, even though plaintiff was not a United States citizen. Rather than indicate that the question bore no relevance to plaintiff's guilty plea, the judge determined that the question should have triggered a discussion between plaintiff and Walshe regarding the potential for deportation. The judge's findings illuminate what occurred:
Mr. Walshe testified that he was unaware of [plaintiff's] immigration status when he completed plea forms for [plaintiff] on July 26, 2000, a Wednesday. In accordance with Mr. Walshe's usual procedure on busy Wednesday plea days, where conversations with a client take place quickly, under the pressure to see other waiting clients and in a noisy holding area, Mr. Walshe believes that on [plaintiff's] behalf Mr. Walshe himself circle "N/A" as the answer to Question *1038 17 on the standard Plea Form without discussing it with [plaintiff]. . . .
Mr. Walshe testified that he would have done this based upon the assumption that [plaintiff] was a U.S. citizen, but without specific confirmation of this fact. Mr. Walshe's usual procedure on busy Wednesdays was to discuss a proposed sentence with his client, and if the client accepted a plea, indicate that questions 16 to 19 on the plea form did not apply to the client. He would therefore circle "N/A" in response to those questions, typically without ever discussing them with his clients. He would follow this procedure unless an accent or other specific information raised the citizenship issue.
Mr. Walshe testified that he was quite certain that he instructed [plaintiff] that questions 16 to 19 on the plea form did not apply to him.
Based on this advice, given during a very busy plea day, [plaintiff] did not independently review Question 17. This meant that Mr. Walshe and not [plaintiff] had made the decision that the question was not relevant.
Based upon these and other findings of fact, the PCR judge concluded that the application of the test established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),[1] as applied in matters concluded by a guilty plea, Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985),[2] compelled a determination that plaintiff had been deprived of the effective assistance of counsel, and was entitled to have his guilty plea set aside. An order memorializing the PCR judge's decision was entered on December 3, 2003.
In granting relief, the PCR judge observed that plaintiff's native country had refused to accept him as a deportee, which led to plaintiff's "indefinite incarcerat[ion] in the United States for this crime." By the time post-conviction relief was granted, plaintiff had served half of his three-year prison term, even though he had otherwise been eligible for parole nine months into his term. The PCR judge found this to be "an additional penal consequence" resulting from the faulty advice rendered by Walshe.
After post-conviction relief was granted, the State agreed to allow plaintiff to plead guilty to a disorderly persons offense of using offensive language, for which he was fined $155, and also agreed to dismiss the other charges, for which plaintiff had served a considerable amount of prison time.

*1039 B
On February 13, 2004, acting pro se, plaintiff served a tort claim notice, stating his intent to seek damages because of defendants' allegedly negligent legal advice. His current counsel filed the complaint in this action against defendants on November 18, 2005.[3] Because the defendants here are a public entity and its employee, the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, has application to the claims asserted in the complaint. Defendants moved for summary judgment, urging that plaintiff failed to serve his notice of claim before "the ninetieth day after accrual of the cause of action," N.J.S.A. 59:8-8. This motion brought to a head the parties' dispute as to when this criminal malpractice action had accrued.
Plaintiff argued that the action did not accrue until the PCR judge granted relief on December 3, 2003, which, if correct, would mean that the notice of claim was timely served and the complaint timely filed; defendants argued that the cause of action accrued on September 12, 2000, when the INS gave notice that plaintiff's deportation would be sought, which would mean that the notice of claim was not timely served, that the time within which a judge could extend the ninety-day time frame for service of such a notice had elapsed,[4] and that the time to file suit against defendants had also expired.[5]
In an oral decision, the trial judge determined that the cause of action accrued on September 12, 2000, and dismissed the action.

II
Plaintiff's appeal requires that we ascertain the accrual date of this legal malpractice action, which arises from the alleged negligent representation of an accused in a criminal matter (hereafter generally referred to as a "criminal malpractice action"). Since the material facts are not in dispute, we examine the summary judgment by considering whether the judge correctly identified the governing legal principles and whether these principles were correctly applied to the undisputed facts. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).
Our Supreme Court has held that "a legal-malpractice action accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages." Grunwald v. Bronkesh, 131 N.J. 483, 492, 621 A.2d 459 (1993) (citations omitted). In many cases, however, the plaintiff "may *1040 reasonably be unaware of the underlying factual basis for a cause of action," id. at 493, 621 A.2d 459, such that it would be appropriate to deem the accrual of the action postponed until plaintiff learned of sufficient facts to warrant the commencement of the limitations period. Our Supreme Court, in quoting an earlier decision of the California Supreme Court, explained why the accrual of a legal malpractice action would permit application of the discovery rule and the concomitant postponement of the time of accrual:
[N]ot only may the client fail to recognize negligence when he sees it, but often he will lack any opportunity to see it. The doctor operates on an unconscious patient; although the attorney, the accountant, and the stockholder serves [sic] the conscious client, much of their work must be performed out of the client's view. In the legal field, the injury may lie concealed within the obtuse terminology of a will or contract; in the medical field the injury may lie hidden within the patient's body; in the accounting field, the injury may lie buried in the figure of the ledger.
[Grunwald, supra, 131 N.J. at 494, 621 A.2d 459 (quoting Neel v. Magana, Olney, Levy, Cathcart & Gelfand, 6 Cal.3d 176, 98 Cal.Rptr. 837, 491 P.2d 421, 428 (1971)).]
Here, nothing in the record suggests plaintiff knew the deportation consequences of his guilty plea or had an appreciation for his attorney's failure to provide advice in that regard when he entered his guilty plea. In short, on the present record, we conclude that plaintiff reasonably did not know what he now claimsthat substandard advice was rendered on or about July 26, 2000.
Although the discovery rule has application, we observe that plaintiff quickly learned his guilty plea had deportation consequences. Nevertheless, whether the hiatus between the rendering of allegedly substandard advice and plaintiff's awareness of this fact was long or short, ascertaining when the action accrued must be analyzed in the manner directed by Grunwald, namely, "the statute of limitations begins to run only when the client suffers actual damage and discovers, or through the use of reasonable diligence should discover, the facts essential to the malpractice claim." 131 N.J. at 494, 621 A.2d 459. These "key elements," the Court said,
are injury (we use "damage" interchangeably with "injury") and fault. Legally-cognizable damages occur when a plaintiff detrimentally relies on the negligent advice of an attorney. Actual damages are those that are real and substantial as opposed to speculative. In the legal-malpractice context, actual damages may exist in the form of an adverse judgment. However, a client may suffer damages, in the form of attorney's fees, before a court has announced its decision in the underlying action. "`It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises.'" Therefore, although an adverse judgment may increase a plaintiff's damages, it does not constitute an indispensable element to the accrual of a cause of action.
[Id. at 495-96, 621 A.2d 459 (citations omitted).]
In this sense, the Court rejected the contention that "no legally-cognizable injury had occurred until the adverse judgment had been affirmed on appeal," and concluded that uncertainty about how the underlying case may be resolved "does not alter the time when the underlying injury or harm occurs and becomes cognizable for purposes of triggering the accrual of a cause of action." Id. at 496, 621 A.2d 459.
*1041 Turning to the fault aspect of the analysis in the legal-malpractice context, the Court in Grunwald observed that "knowledge of fault may occur before or during a judicial resolution of the underlying action," and also that the rendering of an adverse ruling need be neither the earliest nor latest moment at which knowledge of fault has occurred. Id. at 497, 621 A.2d 459. The Court explained:
Even after an adverse ruling, a litigant may reasonably not associate the injury with an attorney's negligent advice. Although litigants are not noted for an ability dispassionately to appraise both sides of their own lawsuits, nevertheless under some circumstances a litigant may conclude that the underlying case was lost on the merits; then, after seeking independent legal counsel regarding an appeal of the underlying claim, that litigant may become persuaded that the attorney's negligence actually caused the loss. Consequently, we reject the general assumption in Mant [v. Gillespie, 189 N.J.Super. 368, 374, 460 A.2d 172 (App.Div.1983)], that, at the latest, a litigant should become aware of an attorney's fault when the trial court renders its decision in the underlying action.
Moreover, an allegedly-negligent attorney's continuous representation on the appeal of the underlying claim may prevent a litigant from becoming aware of the key element of fault. In the medical-malpractice context we stated that "it would be inequitable for a physician who has given * * * assurances [of progress towards recovery] to claim that a patient, in relying upon them and not suspecting their falsity or inaccuracy, failed to exercise the `reasonable diligence and intelligence' required by the discovery rule." Lynch [v. Rubacky, 85 N.J. 65, 75, 424 A.2d 1169 (1981)]. The reasoning in Lynch is equally applicable in the legal-malpractice context.
[Grunwald, supra, 131 N.J. at 498-99, 621 A.2d 459 (some citations omitted).]
Here, we are required to assume the truth of the allegation that Walshe failed to advise plaintiff of the deportation consequences of his guilty plea, and that, based upon this allegedly faulty advice, plaintiff pled guilty to a crime that triggered his potential deportation. Plaintiff knew of these circumstances no later than September 12, 2000, when he received a notice from the INS that his deportation would be sought. Indeed, the fact that plaintiff's motion for withdrawal of his guilty plea, which was based upon his attorney's failure to inform him of the deportation consequences, was denied on September 21, 2000, fixes the latest point for the accrual of the action under the approach required by Grunwald. Plaintiff knew of the attorney's failure to advise of the deportation consequences, was certainly aware that deportation was being sought, and was confronted with the fact that his attempt to abort those deportation proceedings through a withdrawal of his guilty plea had failed. Accordingly, if limited to the principles contained in Grunwald, we would be required to conclude that the alleged cause of action accrued no later than September 21, 2000, and that plaintiff's notice of claim was not timely served and his complaint not timely filed.

III
Notwithstanding that the Grunwald approach leads to a conclusion that this action is time-barred, plaintiff argues that his criminal malpractice action did not accrue until he was exonerated by way of post-conviction relief, which was granted on December 3, 2003. Since our courts have had little experience with the accrual of criminal malpractice actions, we find it *1042 appropriate to consider the decisions of courts of other jurisdictions, which have adopted a number of different approaches to the question. Although there are variations that blur their boundaries, we observe that courts have devised four different approaches for ascertaining the accrual date of criminal malpractice actions.
The first group concludes that an additional element to the calculus used to define the accrual of a malpractice action must be imposed. However, this group of jurisdictions is divided: one camp requires that the plaintiff plead and ultimately prove actual innocence of the underlying criminal charges, while the other requires that the plaintiff obtain exoneration by way of post-conviction proceedings[6] before the action accrues. A second group rejects the imposition of any additional requirement and makes no distinction between the accrual of a criminal malpractice action and the accrual of legal malpractice actions that arise from other arenas. A third group is not necessarily in agreement about the impact of either actual innocence or exoneration, but has adopted a pragmatic two-track approach, which defines accrual in this context as in any other, but requires that there should either be pending or then filed post-conviction proceedings in the criminal matter and, additionally, that the malpractice action should ordinarily be stayed pending the completion of the criminal proceedings. A fourth approach was taken in Alampi v. Russo, 345 N.J.Super. 360, 785 A.2d 65 (App.Div.2001), where we concluded that the plaintiff's utter failure to have sought post-conviction relief by either direct appeal or petition pursuant to R. 3:22 barred his criminal malpractice action, but that the overall subject was too nuanced to lend itself to any of the bright line rules adopted in other jurisdictions. We did not then discuss the two-track approach as a possible solution, but the facts presented in Alampi would have, we observe, warranted dismissal under the two-track approach as well, because the plaintiff had not commenced any post-conviction proceedings at or prior to the time he filed his civil suit.
After careful examination, we reject the approach that requires additional proof for ascertaining when the criminal malpractice action accrues; we are satisfied that the requirement of actual innocence illogically and unfairly bars valid and legitimate claims of malpractice and that the exoneration element fails to set a predictable or desirable date for accrual. On the other hand, as we held in Alampi, the result of such post-conviction proceedings are relevant to the civil actiona view to which we continue to adhere. We also continue to recognize, as discussed in Alampi, that circumstances may be presented in future cases that are too varied and unique to allow for the adoption of a bright line rule. To accommodate these views, we conclude that the two-track approach provides a sufficiently clear approach and ought to be applied in the future.
To fully explain the reasons for our holding, we will first briefly describe the various approaches taken in other jurisdictions and the reasons for their adoption. Second, we will analyze the difficulties presented by some courts' focus on actual innocence. Third, we will examine the relevance of exoneration and set forth the reasons for our holding that exoneration as a trigger for accrual would create unpredictable *1043 and undesirable results. And fourth, we will discuss the two-track approach to this problem and explain why we deem it the most appropriate way to deal with the accrual and management of criminal malpractice actions regardless of the myriad nuanced circumstances that may arise in the future.

A. An Overview
As indicated, those jurisdictions that impose an additional element for the accrual of criminal malpractice actions are divided into two groups. One group, in an effort to vindicate various policy considerations, has concluded that "only an innocent person wrongly convicted [may] be deemed to have suffered a legally compensable harm." Coscia v. McKenna & Cuneo, 25 Cal.4th 1194, 108 Cal.Rptr.2d 471, 25 P.3d 670, 674 (2001) (emphasis added). This hypothesis assumes that it is not the attorney's performance but plaintiff's own criminal conduct that has generated any harm caused by the attorney's negligence. Id. 108 Cal. Rptr.2d 471, 25 P.3d at 673. California is not alone in adopting an actual innocence requirement. See Gomez v. Peters, 221 Ga.App. 57, 470 S.E.2d 692 (1996); Lamb v. Manweiler, 129 Idaho 269, 923 P.2d 976 (1996); Paulsen v. Cochran, 356 Ill.App.3d 354, 292 Ill.Dec. 385, 826 N.E.2d 526 (2005); Ray v. Stone, 952 S.W.2d 220 (Ky.Ct.App.1997); Berringer v. Steele, 133 Md.App. 442, 758 A.2d 574 (2000); Glenn v. Aiken, 409 Mass. 699, 569 N.E.2d 783 (1991); State ex rel. O'Blennis v. Adolf, 691 S.W.2d 498 (Mo.Ct.App.1985); Rodriguez v. Nielsen, 259 Neb. 264, 609 N.W.2d 368 (2000); Mahoney v. Shaheen, Cappiello, Stein & Gordon, 143 N.H. 491, 727 A.2d 996 (1999); Carmel v. Lunney, 70 N.Y.2d 169, 518 N.Y.S.2d 605, 511 N.E.2d 1126 (1987); Robinson v. Southerland, 123 P.3d 35 (Okla.Civ.App.2005); Brown v. Theos, 345 S.C. 626, 550 S.E.2d 304 (2001); Ang v. Martin, 154 Wash.2d 477, 114 P.3d 637 (2005); Reimann v. Ginsberg, 224 Wis.2d 937, 592 N.W.2d 319 (Wis.Ct.App. 1999).
The other group that imposes an additional element asserts that a criminal malpractice plaintiff must allege that he has been exonerated. As expressed by a sharply-divided Supreme Court of Texas, "plaintiffs who have been convicted of a criminal offense may negate the sole proximate cause bar to their claim for legal malpractice in connection with that conviction only if they have been exonerated on direct appeal, through post-conviction relief, or otherwise." Peeler v. Hughes & Luce, 909 S.W.2d 494, 497-98 (Tex.1995) (emphasis added). See also Streeter v. Young, 583 So.2d 1339 (Ala.1991); Shaw v. State, 816 P.2d 1358 (Alaska 1991); Glaze v. Larsen, 207 Ariz. 26, 83 P.3d 26 (2004); Steele v. Kehoe, 747 So.2d 931 (Fla.1999); Trobaugh v. Sondag, 668 N.W.2d 577 (Iowa 2003); Canaan v. Bartee, 276 Kan. 116, 72 P.3d 911 (2003); Noske v. Friedberg, 670 N.W.2d 740 (Minn.2003); Morgano v. Smith, 110 Nev. 1025, 879 P.2d 735 (1994); Stevens v. Bispham, 316 Or. 221, 851 P.2d 556 (1993); Bailey v. Tucker, 533 Pa. 237, 621 A.2d 108 (1993); Gibson v. Trant, 58 S.W.3d 103 (Tenn.2001); Adkins v. Dixon, 253 Va. 275, 482 S.E.2d 797 (1997).
We also observe that one jurisdiction has adopted a unique variation on both the actual innocence and exoneration themes adopted by these two groups. In Shaw v. State, the Supreme Court of Alaska held that the statute of limitations in a criminal malpractice matter does not begin to run until the criminal defendant obtains post-conviction relief. 816 P.2d at 1360. When the matter was reviewed again at a later date, the court concluded that the "innocence or actual guilt" of the criminal malpractice plaintiff "is relevant," but declined *1044 "to place the burden of proving actual innocence on the plaintiff," explaining:
We have already burdened a criminal defendant bringing a malpractice action against his defense attorney by requiring the additional element of first obtaining post-conviction relief. Rather than require the plaintiff to prove his actual innocence in order to succeed, we hold that the defendant may raise the issue of plaintiff's actual guilt as an affirmative defense. The attorney, or in this case the State, as the party raising the affirmative defense, will thus have the burden of proof by a preponderance of the evidence as to the actual guilt of the plaintiff.
[Shaw v. State, 861 P.2d 566, 572 (Alaska 1993) (footnotes deleted).]
The Supreme Court of Alaska also drew a distinction between "legal" guilt and "actual" guilt. The former, which the court found was not relevant in a criminal malpractice action, was defined as the determination "made by the trier of fact in a criminal trial." Id. at 570 n. 3. "Actual guilt" was defined as being "intended to refer to a determination in a civil trial, by a preponderance of the evidence, that the defendant engaged in the conduct he was accused of in the prior criminal proceeding." Ibid. It is "actual guilt," as so defined, that may be proved by the attorney-defendant as an affirmative defense to the malpractice action. Ibid. We are not aware of any other jurisdiction that follows Alaska's approach.
On the other hand, there is a second group of jurisdictions that impose no additional requirement. In Krahn v. Kinney, 43 Ohio St.3d 103, 538 N.E.2d 1058, 1061-62 (1989), the court held that to be consistent with the manner in which other legal malpractice actions are deemed to have accrued, it would be inappropriate to add a requirement that plaintiffs be required to prove actual innocence or exoneration. See also McCord v. Bailey, 636 F.2d 606 (D.C.Cir.1980); Smothers v. Clouette, 326 Ark. 1017, 934 S.W.2d 923 (1996); Rantz v. Kaufman, 109 P.3d 132 (Colo.2005); Silvers v. Brodeur, 682 N.E.2d 811 (Ind.Ct. App.1997); Dowell v. Hollingsworth, 649 So.2d 65 (La.Ct.App.1994); Gebhardt v. O'Rourke, 444 Mich. 535, 510 N.W.2d 900 (1994); Jepson v. Stubbs, 555 S.W.2d 307 (Mo.1977); Ereth v. Cascade County, 318 Mont. 355, 81 P.3d 463 (2003); Duncan v. Campbell, 123 N.M. 181, 936 P.2d 863 (Ct.App.1997). The views espoused by these courts reject the notion that plaintiffs in criminal malpractice actions have not been damaged by the negligent advice or conduct of their attorneys until exoneration occurs. This view is most persuasively exemplified by the forceful concurring opinion in Stevens v. Bispham, where Justice Unis concluded that the exoneration rule adopted by the majority was "divorce[d] . . . from reality," and stated:
I believe that plaintiff and other persons convicted of a crime will be astonished to learn that, even if their lawyer's negligence resulted in their being wrongly convicted and imprisoned, they were not harmed when they were wrongly convicted and imprisoned but, rather, that they are harmed only if and when they are exonerated.
[851 P.2d at 566.]
The third approach adopts a more pragmatic approach not necessarily linked to the relevance of exoneration for defining when a criminal malpractice action accrues. This is the so-called two-track approach. It first defines accrual no differently than the standard applied in other legal malpractice actions and requires that, when the action is filed, there either then be filed, if not already pending, some form of post-conviction proceeding seeking to undo some of the harm allegedly caused by *1045 attorney negligence. The second track requires that the trial court stay the criminal malpractice action pending the outcome of the post-conviction proceedings. It has been adopted by jurisdictions that require proof at trial of actual innocence, see Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 680; Berringer, supra, 758 A.2d at 604; Seevers v. Potter, 248 Neb. 621, 537 N.W.2d 505, 511 (1995), or exoneration, see Bailey, supra, 621 A.2d at 115 n. 13, as well as those that employ neither actual innocence or exoneration as accrual triggers, see Gebhardt, supra, 510 N.W.2d at 907; Duncan, supra, 936 P.2d at 868-69; Ereth, supra, 81 P.3d at 469.
The fourth approach recognizes that circumstances may greatly vary and that the adoption of a bright line rule might unfairly bar valid claims. Alampi, supra, 345 N.J.Super. at 371, 785 A.2d 65. There, we examined the decisions of the high courts of California, Texas and Ohio, but, instead of choosing among any of those approaches, held:
We need not and do not reach the question of the requirement for exoneration from a criminal conviction in all cases before a plaintiff in this type of case can make out a jury issue. A more propitious fact pattern for a plaintiff perhaps may emerge in a future case; thus, for now, we eschew a "bright line" rule requiring exoneration in all cases.
[Id. at 371, 785 A.2d 65.]
In addition, an intermediate appellate court in North Carolina concluded that the burden of proof "to show proximate cause" in a criminal malpractice action "is, for public policy reasons, necessarily a high one," but did not define that higher standard and, like Alampi, "decline[d] to adopt a `bright-line' rule." Belk v. Cheshire, 159 N.C.App. 325, 583 S.E.2d 700, 706 (2003). We are not aware of any other jurisdiction that has refused to adopt a bright line rule, as held in Alampi and Belk.[7]

B. Actual Innocence
Even though we found it inadvisable in Alampi to construct a single rule for all criminal malpractice actions, and concluded that cases should be viewed individually, the panel's decision appears to have sub silentio rejected the "actual innocence" approach. That is, we there indicated that whether the "exoneration" requirement should be imposed must be decided on a case-by-case basis. 345 N.J.Super. at 371, 785 A.2d 65. We assume from this particular choice of language that the panel found the application of an "actual innocence" requirement to be inappropriate. To the extent our opinion in Alampi leaves any doubt on that point, we dispense with it now, because, in our view, requiring that a plaintiff both plead and prove actual innocence imposes an unrealistic and far too strenuous obstacle on a criminal malpractice action.
Courts have adopted an actual innocence rule for three policy reasons: (1) because they believed that absent proof of actual innocence, the suit would allow the criminal to profit from his own wrong; (2) because, in their view, recovery would impermissibly shift responsibility away from the criminal; and (3) because the wrongfully-convicted have an adequate remedy in the form of post-conviction relief for ineffective assistance of counsel. Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 673. *1046 We find these policies disconnected to the realities of the matter and little more than excuses to prohibit actions brought by convicted persons.
First, we do not disagree that criminals ought not profit from their wrongful actions, a policy reason frequently cited for requiring proof of actual innocence. But the imposition of a civil remedy based on an attorney's negligence does not generate a profit from the criminal defendant's alleged wrongdoing; it is merely a device for compensating the plaintiff for an injury caused as the result of another's negligence that is not logically related to or governed by the underlying criminal conduct.
Second, we fail to understand how permitting a civil recovery in favor of a party, who may not be innocent of a charge, against his criminal defense counsel impermissibly shifts responsibility away from the criminal. To the contrary, if the plaintiff remains convicted of the charge because of his attorney's negligence, he remains, as said by the Supreme Court of Alaska, "legally guilty," Shaw, supra, 861 P.2d at 570, and responsible in the eyes of the law for the crimes for which he was convicted. That fact is not altered by the outcome of a civil action limited to determining whether the plaintiff was damaged by an attorney's negligent performance in the underlying criminal matter.
In any event, we view the assertion of this second policy consideration as ineffectual. As stated in dissent, the majority's adoption in Peeler of a rule requiring proof of actual innocence was based in part "on its belief that all criminal acts are so reprehensible that permitting someone convicted of a crime to recover against his or her former attorney for professional negligence `would shock the public conscience, engender disrespect for courts and generally discredit the administration of justice.'" 909 S.W.2d at 500 (Phillips, C.J., dissenting). This policy represents no more than antagonism for the legitimate claims of persons who have been convicted of a crime. As one court described it, the requirement of proof of actual innocence is salutary because it "prevent[s] a flood of nuisance litigation." Falkner v. Foshaug, 108 Wash.App. 113, 29 P.3d 771, 776 (2001). In short, it is difficult to view the application of this policy as espousing any philosophy other than a desire to keep the floodgates closed to suits filed by convicted criminals. We find this approach to be inconsistent with the understanding that the common law favors the availability of a remedy when a person has been damaged by the negligent conduct of another who owes that plaintiff a duty of care and is blind to the possibility that the plaintiff has not led a blameless life. Although this legal fiction may be all that holds back a flood of lawsuits, we cannot overlook the possibility that there may be meritorious claims in those flood waters; they should be resolved on their merits and not precluded by an artificial bar.
Indeed, this legal fiction not only bars the claims of the convicted, but also may serve to swallow up the claims of the acquitted. An accused, upon acquittal is, in the eyes of the law, "free to go." That person was presumed innocent when charged and remains presumed innocent when acquitted. That status is, as our Supreme Court has recognized, "of primordial origin." State v. Ingenito, 87 N.J. 204, 213, 432 A.2d 912 (1981) (citations omitted). Yet, courts that have adopted this approach have also insisted that an acquitted person must prove his innocence of the charges during the criminal malpractice action. See Ang v. Martin, supra, 114 P.3d at 641-43. In permitting this rule to have such a reach, those courts have completely divorced the rule from the *1047 policy considerations upon which it was based. In other words, if the imposition of this element is based on antagonism toward persons who have committed crimes, or because criminals should not profit from their crimes, or because the civil verdict may transfer responsibility away from the criminal, then why is this requirement imposed on those who have not been convicted? Why would it bar the claim of a person who has been presumed innocent and who has not been found otherwise by a jury? This illogical application of the actual innocence rule vindicates no clear public policy and simply exhibits hostility toward these claims because they are viewed as "nuisance litigation"[8] and may flood our courts.
The third reason cited as a basis for the actual innocence rule is that post-conviction relief procedures are available to those plaintiffs. We reject this as well. The availability of post-conviction procedures are intended to address the fairness of the criminal proceedings and to protect an accused's constitutional rights. Those procedures do not reach so far as to provide the accused with a monetary remedy based upon an attorney's negligence despite the fact that the attorney's negligence may have caused damage. In short, the granting of post-conviction relief does not remedy all the harm caused by a negligent attorney. In that circumstance, the defendant may have gained a new trial, but he is not also awarded, for example, monetary relief to compensate for the wasted fees paid to the attorney who failed to effectively represent the defendant. Although there is a logical relationship and indeed overlapping of the subject matter in the post-conviction proceedings and the criminal malpractice action, the relief available is not the same. Accordingly, the existence of one remedy should not preclude the other.
In addition, the third policy reason, which places a heavy burden on a plaintiff in a criminal malpractice action because the plaintiff has the right to seek post-conviction relief, would also tend to eliminate the societal benefit of encouraging good lawyering through the imposition of civil liability. That is, tort liability is imposed not only to provide compensation for an injured party, but also as an incentive to the civil defendant, and others similarly situated, to better conform in the future to a certain standard of care. See People Express Airlines v. Consol. Rail Corp., 100 N.J. 246, 266, 495 A.2d 107 (1985). Insulating criminal defense attorneys from malpractice suits brought by former clientsthrough the heavy burden of requiring proof of plaintiff's actual innocencemay have an insidious tendency to lower professional standards. Just as their colleagues who practice in other areas are held to high professional standards of care through, in part, the potential for monetary judgments based on their negligence, criminal defense attorneys should also be subject to the same liability so that they have the same incentive to meet the professional standards of care required by our court rules and the Sixth Amendment. We, thus, reject the actual innocence standard adopted by other jurisdictions because it does little more than provide immunity *1048 from negligence actions for those attorneys who practice in this area.
In addition to finding little substance in the three policy reasons cited in support of an actual innocence rule, we question the fairness of barring the claims of all criminal defendants except those who are actually innocent. Take for example, John Doe, a fictional person who has actually committed only a simple theft but has been indicted for more serious offenses, such as robbery. If Doe's defense counsel negligently handles the matter, and Doe is convicted of robbery and sentenced accordinglywhen a competent performance by an attorney would only have resulted in a conviction for simple theftthen the elements of professional negligence, in our view, have been breached. His attorney negligently failed to obtain a result that a competent performance would have obtained, and, as a result, John Doe will spend many more years in prison than he would have if convicted of theft. The equal application of our common law would suggest that John Doe should have an actionable claim against his attorney. But John Doe cannot claim his innocence. He is guilty of theft. In a jurisdiction that requires proof of actual innocence, we presume that John Doe would have no actionable claim, even if he is later granted post-conviction relief based upon the ineffective assistance of counsel. And yet, the damage he has suffered is very real, measured by the extra years he will serve in prison.[9] In light of potential outcomes such as this, we conclude that insistence upon proof of actual innocence as an element of a criminal malpractice action will have a tendency to bar the commencement of otherwise meritorious actions and would vindicate only a misguided policy that guilty persons are not entitled to be represented by competent attorneysa policy entirely at odds with the Sixth Amendment.
In summary, we reject the imposition of the additional element of actual innocence because it requires that the plaintiff prove too much. Our criminal justice system does not seek to adjudicate whether a person is innocent, only whether a person is guilty. See, e.g., State v. White, 360 N.J.Super. 406, 413, 823 A.2d 804 (App.Div.2003). Accordingly, any relief obtained by the criminal defendant following a conviction based upon an attorney's negligence will not consist of a declaration of that person's innocence. In the final analysis, to expect a plaintiff to prove, in order to obtain monetary relief against his negligent attorney, that he was not only not guilty but actually innocent is tantamount to holding that attorneys are under no duty to competently represent guilty criminals.

C. Exoneration
A rule that makes the accrual of a criminal malpractice action dependent upon whether or when the plaintiff obtains exoneration is also fraught with pitfalls because exoneration (1) presents an elusive standard; (2) could bar valid claims when gross negligence negates the availability of post-conviction relief; and (3) creates uncertainty about the date of accrual. In other words, exoneration lends itself to *1049 impracticable and unfair application, which has the potential deleterious effect of hopelessly delaying, to the detriment of the litigants and our courts, the commencement of criminal malpractice actions.
The primary problem with such a rule is the uncertainty it generates about when it may be fairly said in a given case that exoneration has occurred. Jurisdictions that require proof of exoneration as a predicate to the accrual of a criminal malpractice action have not always been clear about what they mean. As observed by one court, those jurisdictions have not clarified whether exoneration occurs when the defendant "achieves successful post-conviction relief, when he is retried and a different result is achieved, or when he can no longer be retried for the same crime." Silvers, supra, 682 N.E.2d at 818.
The uncertainties surrounding the application of an exoneration rule are plentiful. In the case at hand, we question, if we were to apply an exoneration rule, whether plaintiff was exonerated when the conviction was vacated on December 3, 2003, or whether he was exonerated on the later date when the State agreed to allow a guilty plea to a disorderly persons offense in exchange for the dismissal of the aggravated assault charge? Moreover, could it be said that even in that circumstance plaintiff was truly exonerated? Here, it has been argued, although not ultimately determined, that the State agreed to dismiss the aggravated assault charge only because plaintiff had already served a significant prison term and no good would come from further prosecution. Does this type of disposition fairly constitute exoneration of the charges imposed? The uncertainty generated by these and similar questions alone suggests that exoneration is not entirely suitable for defining when a criminal malpractice action accrues.
Second, as the court observed in Silvers, defendants who are prevented from pursuing post-conviction relief precisely because of their attorneys' malpractice will be entirely without opportunity for relief, thus allowing attorneys to escape liability by virtue of their own gross negligence. 682 N.E.2d at 818.
Third, the very uncertainty that caused our colleagues in Alampi to decline the invitation to adopt exoneration as a bright line rule, 345 N.J.Super. at 371, 785 A.2d 65, leads us to conclude that accrual of the action should not depend upon the granting of post-conviction relief. In reaching this conclusion, we adhere to the holding in Grunwald that the accrual of a civil malpractice action does not stand in abeyance while the plaintiff pursues an appeal or relief from the judgment that has caused damage. 131 N.J. at 496, 621 A.2d 459.
The bedrock of any decision worthy of the public's respect is that which is based on more than "expediency or a private view of moralityboth of which take on color and shade from the eye of the beholder." Zeller v. Donegal Sch. Dist. Bd. of Educ., 517 F.2d 600, 607 (3d Cir.1975) (quoting James D. Hopkins, Public Policy and the Formation of a Rule of Law, 37 Brook. L.Rev. 323, 324 (1971)). As we have held, the plaintiff's actual innocence has no real nexus to the issues raised in the malpractice action; were we to state otherwise, we would essentially be holding that guilty persons are not entitled to competent representation. In other words, the actual innocence rule is best understood as vindicating private views of morality. Beside such a holding's obvious antagonism to the Sixth Amendment and the fundamental understanding that both the innocent and the guilty are entitled to competent counsel, the imposition of an actual innocence element can only serve to bar an enormous percentage of such claims *1050 for no reason other than to satisfy a policy antagonistic to the accused. By the same token, requiring proof of exoneration will often raise more questions than it can hope to answer. Because a requirement of exoneration will engender confusion and uncertainty about the date of accrual, its rejection is necessary in order to provide predictability or reckonability in this uncertain area. See Getty Ref. & Mktg. Co. v. M/T Fadi B., 766 F.2d 829, 833 (3d Cir.1985).
The imposition of an additional element would pose staggering difficulties for parties because of the long delays that normally pass between conviction and the granting of post-conviction relief. In our experience, the interval of three years from plaintiff's guilty plea to the granting of post-conviction relief was rather short. Examples of far greater intervals are readily available. See, e.g., State v. Burgess, 154 N.J. 181, 182, 712 A.2d 631 (1998) (affirming the grant of post-conviction relief seven years after defendant's conviction); State v. Afanador, 151 N.J. 41, 697 A.2d 529 (1997) (granting post-conviction relief nine years after defendant's conviction); State v. Damon, 286 N.J.Super. 492, 495, 669 A.2d 860 (App.Div.1996) (granting post-conviction relief six years after defendant's conviction was affirmed on direct appeal; the court's opinion does not indicate the date of conviction). The imposition of an exoneration element could delay accrual of a criminal malpractice suit for many years.
The delay caused in the accrual and commencement of a civil action that would result from requiring proof of exoneration as an element of that action has another deleterious effect. The potential for exoneration not occurring for many years, as we have observed, and its potential to cause a lengthy delay in the commencement of a civil action, will likewise delay the attorney's awareness of the potential claim. Fading memories and lost files resulting from lengthy delays in receiving notice of a suit may cause severe prejudice to attorney-defendants and confound the presentation of the proofs to a factfinder in such matters. As Justice Clifford said in Grunwald, "[a] system that would permit a plaintiff to commence a malpractice claim fifteen years after an attorney renders allegedly negligent advice is simply unacceptable." 131 N.J. at 497, 621 A.2d 459. Such delays, in our experience, would be far more common in criminal malpractice actions than in the civil malpractice actions envisioned in Grunwald.
As a result, in fairness to all parties to criminal malpractice actions, we reject a process that fixes the accrual date on exoneration. The approach we embrace recognizes that accrual will occur in the same time-honored approach adopted by the Court in Grunwald. It also avoids potential due process or equal protection claims that might be asserted by criminal malpractice plaintiffs in future matters as a result of having been treated differently than other litigants solely because of their status as convicted criminals.

D. The Two-Track Approach
As we have indicated, the absence of any additional element in criminal malpractice actions characteristic of the two-track approach does not render irrelevant what does or does not occur in post-conviction proceedings. Whether a court should later accept or reject the argument that a plaintiff did not receive the effective assistance of counsel does have a bearing on the malpractice action. Indeed, it is conceivable that such findings may bar the plaintiff from arguing to the contrary in a subsequent action, and the pursuit of both a civil malpractice action and post-conviction relief proceedings may have a tendency at times to generate a duplication of *1051 efforts. See generally McCord, supra, 636 F.2d at 610 (citation omitted); Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 675-76; Alberici v. Tinari, 374 Pa.Super. 20, 542 A.2d 127, 133 (1988). For these reasons, we conclude that the so-called two-track approach best achieves the goals of certainty and predictability in ascertaining the date of accrual without causing a rush to judgment in the criminal malpractice action before the post-conviction proceedings run their course and without duplicating the courts' efforts in both matters.[10]
Our adoption of this two-track approach has the benefit of consistency with our Supreme Court's delineation of the elements of civil malpractice actions, as outlined in Grunwald, and yet gives recognition to the fact that a criminal malpractice action is different and should not necessarily proceed to a conclusion until the plaintiff's post-conviction applications further refine the damage caused by the attorney's alleged negligence.
We thus find the most salutary approach to be that which concludes that the action accrues as it would in Grunwald, but that many such claims warrantdepending upon their own peculiaritiesa stay of the civil action pending the completion of post-conviction proceedings, as also suggested by Grunwald when a civil litigant has appealed a judgment that it claims was entered as a result of attorney negligence. 131 N.J. at 499, 621 A.2d 459 (holding that a stay of the malpractice action while an appeal of the order or judgment entered as a result of attorney negligence "prevents duplicative litigation and saves plaintiffs the discomfort of maintaining inconsistent positions").
This rule undoubtedly will impose an additional managerial burden on our trial courts. However, we have no cause to believe there are many criminal malpractice actions pending in our trial courts. And, regardless, we conclude that the future need of the trial courts to occasionally review actions placed in suspense pending the completion of criminal proceedings is a small price to pay for the adoption of a rule that insures the seasonable and prompt commencement of such actions as opposed to a rule that could delay for many years the accrual of such actions.
This two-track approach provides an advantage to the suitor because it permits a better and clearer understanding of the date upon which the action accrues. And it provides an advantage to the defendant-attorney by creating a system that provides notice and commencement of the suit at a reasonable point in time, so that the attorney may gather all pertinent records, give notice to an insurer, and take any other appropriate steps to prepare a defense to the claim. Attorneys, of course, will not welcome such claims, and may view our holding as being more hospitable to malpractice actions than a process that would delay the commencement of such *1052 actions. We have no way of fairly assessing whether today's judgment will generate additional suits against attorneys.[11] But if these suits are to come, our holding creates a system by which attorneys will sooner learn of a suit's commencement, not a system that might preclude some suits but would intolerably delay others for many years. We deem it better and more practical for attorneys and their insurers to know sooner of the claim rather than after the many years it may take for a criminal case to reach finality following an application for post-conviction relief.
To summarize, we adopt the two-track approach. The first track requires application of the Grunwald standard in defining accrual as the date upon which the plaintiff knew or had reason to know of attorney negligence that proximately caused damage. The criminal malpractice plaintiff will be required to commence the action within the limitations period that commences on that date. As previously mentioned, an action against a publicly-employed attorney, as here, must be commenced within two years of its accrual, Stoeckel, supra, 387 N.J.Super. at 22-23, 902 A.2d 930, and actions against other attorneys must be commenced within six years, McGrogan, supra, 167 N.J. at 426, 771 A.2d 1187.[12] The second track requires that post-conviction proceedings be commenced no later than the date of the filing of the civil complaint. Depending upon the status of any such post-conviction application, the trial court will ordinarily stay the civil suit pending the outcome of the criminal proceedings since those results will often, if not always, impact the civil action.[13]

IV
What remains for us to decide is how or whether our holding on this troublesome issue impacts plaintiff's suit.
Certainly, we have adopted a new rule that did not exist when Walshe recommended that plaintiff plead guilty to aggravated assault without advising him of the possibility or likelihood of deportation based upon that guilty plea. Although judicial decisions normally apply retroactively, Rutherford Educ. Ass'n v. Bd. of Educ., 99 N.J. 8, 21, 489 A.2d 1148 (1985), "considerations of fairness and justice, related to reasonable surprise and prejudice *1053 to those affected," Green v. Auerbach Chevrolet Corp., 127 N.J. 591, 600-01, 606 A.2d 1093 (1992) (citations and internal quotes omitted), may suggest a different approach. As summarized by the Court in Velez v. City of Jersey City, 180 N.J. 284, 297, 850 A.2d 1238 (2004) (citations omitted), "prospective application is appropriate when (1) the decision establishes a new rule of law, by either overruling past precedent or deciding an issue of first impression, and (2) when retroactive application could produce substantial inequitable results." Perhaps a colorable argument could be presented against the retroactive application of our holding, but we need not now decide the point.
Both the rule we adopt today and the pre-existing decisional law did not impose on plaintiff a requirement of showing either actual innocence or exoneration. Although we now require that some form of post-conviction proceeding be filed or pending when the criminal malpractice action is commenced, that determination has no impact on plaintiff. In short, we have made no alteration in the manner in which accrual is ascertained and our additional requirement that post-conviction proceedings be filed or pending has no relevance in this case because plaintiff failed to timely file his complaint.
As we have observed, plaintiff pled guilty to aggravated assault on July 26, 2000, was notified by the INS on September 12, 2000 that he faced deportation, and, as a result of that notice, unsuccessfully sought to withdraw his guilty plea on September 21, 2000. All these events occurred prior to our decision in Alampi. Accordingly, until Alampi was decided approximately one year later, plaintiff had no reason to suspect that his malpractice claim might have accrued on any date later than September 21, 2000. And, even if Alampi could be viewed as requiring exoneration before a criminal malpractice action may accruewhen we merely held that, in that case, Alampi's failure to seek exoneration demonstrated that he had not presented an issue to go to a jury, 345 N.J.Super. at 371, 785 A.2d 65[14]it could not have impacted plaintiff's claim because the events relevant to accrual here occurred prior to our November 29, 2001 decision in Alampi. Moreover, our application of today's holding is neither unfair nor inequitable. The only reasonable view of the state of the law at the time plaintiff became aware that his attorney's alleged negligence had caused damage, was that which was announced in Grunwald.
Of course, plaintiff would have been aware ofor at least would be chargeable with knowledge ofMcGrogan, which was decided five months prior to plaintiff's guilty plea. But we then only discussed exoneration in dictum. 327 N.J.Super. at 606-09, 744 A.2d 255. And we merely concluded that it was an "interesting" issue but drew no conclusions as to whether it should be adopted or how it would apply. 327 N.J.Super. at 609, 744 A.2d 255. Accordingly, although McGrogan discussed what might occur in the future, the question of accrual of plaintiff's claim was governed *1054 by our Supreme Court's 1993 Grunwald decision. The decision in Alampi, upon which plaintiff greatly relies in arguing that accrual occurred when post-conviction relief was granted, was decided more than one year after the allegedly negligent advice was rendered, after deportation was sought, after plaintiff was unsuccessful in seeking a withdrawal of his guilty plea, and after he went to jail based upon his guilty plea. There being no change in the Grunwald landscape when plaintiff went to jail, there can be no unfairness in our application of those same principles to plaintiff's claim.[15] Accordingly, the only reasonable assessment of the state of the law required an assumption that the action had accrued on September 21, 2000, and that the limitations period contained in N.J.S.A. 59:8-9 for the filing of a malpractice claim against a publicly-employed attorney began to run on that date and ended two years later. Since plaintiff failed to timely serve a notice of tort claim and failed to timely file his civil complaint within the time frames imposed by the Tort Claims Act, based on an accrual date of September 21, 2000, the trial judge correctly dismissed the complaint.
Affirmed.
STERN, P.J.A.D., (dissenting).
We have the obligation to be practical as well as technical, and I cannot join the majority opinion which would, at a minimum, potentially convert every petition for post-conviction relief (PCR) involving a claim of ineffective assistance of counsel by the Public Defender into a case under the Tort Claims Act (TCA), N.J.S.A. 59:8-1 to-11. That would involve almost every petition for post-conviction relief involving the Public Defender.[1] Moreover, we are not dealing with just a legal malpractice case, requiring analysis under the cases relating to accrual for purposes of a legal malpractice action, but also with notice requirements under the TCA. See N.J.S.A. 59:8-8, -9.
Because our TCA is patterned after the California act, we have frequently looked to California for guidance in deciding such issues. See Moon v. Warren Haven Nursing Home, 182 N.J. 507, 514, 867 A.2d 1174 (2005); Levin v. County of Salem, 133 N.J. 35, 46, 626 A.2d 1091 (1993). Nevertheless, it seems to me that a delayed filing approach is preferable to the majority's holding which, like California, permits or requires a tort claims action whenever a criminal defendant feels aggrieved, provided he or she simultaneously files a petition for post-conviction relief. See Coscia v. McKenna and Cuneo, 25 Cal.4th 1194, 108 Cal.Rptr.2d 471, 25 P.3d 670, 680 (2001). Unnecessary TCA filings *1055 should not be encouraged because the Act generally provides immunity to governmental entities and employees except where the statute expressly permits suit. Rochinsky v. State, Dep't of Transp., 110 N.J. 399, 407-11, 541 A.2d 1029 (1988); see also Coyne v. State, Dep't of Transp., 182 N.J. 481, 488, 867 A.2d 1159 (2005).
In Alampi v. Russo, 345 N.J.Super. 360, 369, 785 A.2d 65 (App.Div.2001) (quoting Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 674), we discussed the California requirement "that exoneration from the criminal offense is required in order for a plaintiff to recover in a legal malpractice action because `public policy considerations require that only an innocent person wrongly convicted be deemed to have suffered a legally compensable harm.'" Under California law, "post-conviction exoneration is a prerequisite to prevailing on a legal malpractice claim," against an attorney public or retained. Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 671; see also Barner v. Leeds, 24 Cal.4th 676, 102 Cal.Rptr.2d 97, 13 P.3d 704 (2000) (upholding malpractice action against public defender).
As the majority points out, the California precedent also talks about the "innocence requirement," which "protects against inconsistent verdicts, promotes judicial economy, and encourages the representation of criminal defendants by reducing the risk of baseless malpractice actions." Alampi, supra, 345 N.J.Super. at 370, 785 A.2d 65 (citing Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 675-76). The California Supreme Court has held that "when a former criminal defendant sues his or her attorney for legal malpractice, the former client's actual innocence of the underlying criminal charges is a necessary element of the malpractice cause of action," Coscia, supra, 108 Cal. Rptr.2d 471, 25 P.3d at 671 (citing Wiley v. County of San Diego, 19 Cal.4th 532, 79 Cal.Rptr.2d 672, 966 P.2d 983 (1998)), and that "an individual convicted of a criminal offense must obtain reversal of his or her conviction, or other exoneration by post-conviction relief, in order to establish actual innocence in a criminal malpractice action," id. 108 Cal.Rptr.2d 471, 25 P.3d at 674.
I would not necessarily go as far as California might appear to in requiring the proof of "actual innocence" because people may be convicted as a result of ineffective assistance, whereas they might otherwise be entitled to an acquittal or dismissal, or receive a lesser disposition, with competent representation. An "actual innocence" requirement precludes any recovery where a defendant has pled guilty even though competent counsel could have negotiated a different or lesser disposition. Nevertheless, some exoneration should be required, and the fact that proof of innocence, or at least some exoneration, is required before recovery can be obtained against a public defender is relevant to when the notice under the TCA should be required. See Barner, supra, 102 Cal. Rptr.2d 97, 13 P.3d at 713 (liability dependent on "the requirement that a defendant in a criminal action must prove his or her actual innocence by a preponderance of the evidence before prevailing on a claim against his or her attorney for negligent representation in the criminal proceeding");[2]see also, e.g., Ang v. Martin, 154 Wash.2d 477, 114 P.3d 637 (2005); Adkins *1056 v. Dixon, 253 Va. 275, 482 S.E.2d 797, 801 (1997).[3]
Our precedent "do[es] not reach the question of the requirement for exoneration from a criminal conviction in all cases before a plaintiff in this type of case can make out a jury issue," Alampi, supra, 345 N.J.Super. at 371, 785 A.2d 65, but we should at least require some relief in the criminal matter to evidence the proximate cause necessary to "constitute an actionable claim," Grunwald v. Bronkesh, 131 N.J. 483, 492, 621 A.2d 459 (1993). That relief might be vacation of a guilty plea and dismissal of the charges, entry of judgment on a lesser offense after spending substantial time in custody following conviction for a greater offense or any disposition more beneficial to the criminal defendant than the original judgment. I need not now explore the necessary exoneration short of actual innocence which could suffice, but the criminal defendant should certainly need to secure some relief so as to trigger the accrual of the malpractice claim. See Alampi, supra, 345 N.J.Super. at 368-70, 785 A.2d 65.
Significant to my analysis is the factor that Alampi, to the extent my colleagues rely on it, is neither a Public Defender case nor a case involving a claim under the TCA. It deals with private counsel who allegedly gave poor advice to an accountant client during a federal IRS investigation. Alampi pled guilty in federal court, and we held that summary judgment was properly granted dismissing his legal malpractice action. Id. at 371, 785 A.2d 65.
Thus, I do not necessarily disagree with the majority's rejection of an "actual innocence" approach to the accrual of a legal malpractice action, but the granting of PCR, like reversal of a conviction, is not an adjudication of innocence. It merely voids a judgment of conviction, and the majority advocates the ability to commence a malpractice action even before the defendant achieves PCR, and does so notwithstanding the fact that, even if successful in obtaining PCR, the defendant may be convicted again upon retrial (as he or she might following the reversal of his or her conviction on direct appeal).
As I understand the majority, the malpractice action would require the filing of an action to attack the conviction, if one was not pending, in addition to the notice of tort claim, and the malpractice complaint would have to be filed within the two year statute of limitations after accrual of the action, N.J.S.A. 59:8-8 and -9; Stoeckel v. Twp. Of Knowlton, 387 N.J.Super. 1, 22-23, 902 A.2d 930 (App.Div.2006) (limitations period involving government attorney). And all this is so notwithstanding the great possibility that the ultimate criminal disposition is still pending or may well end with a conviction which precludes a finding of proximate cause or injury. Literally hundreds, if not thousands of cases, would be needlessly filed, and then be stayed (perhaps after some proceedings occur). And all this is so notwithstanding the fact PCR will be denied or defendant will again be convicted, and an essential element of the malpractice action dissipated.
As already noted, the majority draws support from the California approach. See *1057 Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 680. It is here that I cannot follow California precedent. First, it is arguably inconsistent with our application of the discovery rule in legal malpractice actions because damages and fault must be known before the accrual of an action. See Grunwald, supra, 131 N.J. at 494-99, 621 A.2d 459.[4] Furthermore, Grunwald does not involve a public attorney or an issue under the TCA. More importantly, "[s]ince successful termination" or exoneration in a post-conviction proceeding should be a "part of [the] cause of action," Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 678, as is the case in most jurisdictions,[5] the criminal defendant "has no right of action until that time and, thus, the statute of limitations does not begin to run until termination of the post-conviction proceeding," Adkins, supra, 482 S.E.2d at 801; see also, e.g., Canaan v. Bartee, 276 Kan. 116, 72 P.3d 911, 915-16 (2003).
As the Supreme Court of Iowa recently said, "principles of judicial economy and comity, including the avoidance of multiple proceedings related to the same factual and procedural issues, respect for other . . . processes such as post-conviction relief, and the prevention of potentially wasteful practices such as requiring a plaintiff to file a malpractice claim which may never come to fruition" necessitates a holding that the malpractice action "does not accrue until relief from a conviction is achieved." Trobaugh v. Sondag, 668 N.W.2d 577, 583 (Iowa 2003).
I see no "advantage to the defendant-attorney," 397 N.J.Super. at 291, 936 A.2d 1051, which permits a premature action and requires a defense and which, at least potentially, affects the attorney defendant's future malpractice rates when so many petitions for PCR result in no finding which grants relief or which results in relief and a disposition ultimately unfavorable to the criminal defendant.
In short, I would hold that the defendant has to be exonerated to the point of being able to show some injury caused by the alleged malpractice whether that relief is dismissal of the charges, acquittal on retrial, conviction of a lesser included offense or otherwise, before having to file, if not being permitted to file, his or her notice of tort claim. Accordingly, I respectfully dissent from so much of the majority opinion which (although requiring a PCR petition to be filed when a malpractice action is commenced) permits or requires the civil complaint to be filed before the PCR is completed or the criminal defendant is exonerated in some meaningful way. As a result, I would not find this cause of action to be time barred.
Finally, I emphasize by repetition that we have addressed what was presented to us on the appealwhether the complaint was properly dismissed because the notice of claim was not timely served and the complaint was not timely filed. No issue was presented with respect to the issue of liability or immunity under the TCA, and I therefore do not address it.
I respectfully dissent.
NOTES
[1] This test requires that it first be ascertained whether "counsel's representation fell below an objective standard of reasonableness," Strickland, supra, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, and, if so, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
[2] As held in Hill v. Lockhart, supra, 474 U.S. at 58-59, 106 S.Ct. at 370, 88 L.Ed.2d at 210, when applied to a matter in which a defendant has pled guilty, the first half of the Strickland test is "nothing more than a restatement of the standard of attorney competence" previously defined in cases such as Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), and McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). On the other hand, the Court explained that the second requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process," and, thus, that to satisfy this "`prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, supra, 474 U.S. at 59, 106 S.Ct. at 370, 88 L.Ed.2d at 210.
[3] Plaintiff's brief refers to the date of the filing of his complaint as both November 18, 2005 and November 28, 2005. Contrary to R. 2:6-1(b), the copy of the complaint contained in appellant's appendix does not bear the date of filing. We assume for present purposes that the filing occurred on the earlier date.
[4] N.J.S.A. 59:8-9 provides a trial court with the discretion to permit a claimant to file a notice "at any time within one year after accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby" and that the claimant is able to demonstrate "extraordinary circumstances for his failure to file" a timely notice. Once that one-year period elapses, the "court is without jurisdiction to permit filing of a late notice of claim." Williams v. Maccarelli, 266 N.J.Super. 676, 679, 630 A.2d 409 (App.Div.1993).
[5] Legal malpractice suits against private attorneys must be filed no later than six years from the accrual of the action. McGrogan v. Till, 167 N.J. 414, 426, 771 A.2d 1187 (2001). However, when an action has accrued after July 1, 1994, and the complaint seeks relief against publicly-employed attorneys, as here, the complaint must be filed within two years of its accrual. Stoeckel v. Twp. of Knowlton, 387 N.J.Super. 1, 22-23, 902 A.2d 930 (App. Div.2006).
[6] In these cases, and in our holding as well, the post-conviction proceedings referred to are not intended to be limited to applications pursuant to R. 3:22 for post-conviction relief, but may also include a direct appeal of the conviction or application for a writ of habeas corpus.
[7] In dictum, another panel of this court found the argument that accrual did not occur until exoneration to be "an interesting issue," but concluded that it "need not decide the exoneration issue" because other reasons justified dismissal of that action. McGrogan v. Till, 327 N.J.Super. 595, 609, 744 A.2d 255 (App. Div.2000), aff'd, 167 N.J. 414, 771 A.2d 1187 (2001).
[8] In Ang, the criminal malpractice plaintiffs brought suit against their former attorneys, alleging that they were negligently advised to accept a plea bargain. 114 P.3d at 639. Upon review of the matter by new counsel, plaintiffs were advised to pursue and did in fact obtain permission to withdraw their pleas. Ibid. At trial, they were acquitted on all counts. The court held that plaintiffs' malpractice action required not only that they show they obtained relief from their conviction, which they had, but also that they were actually innocent of the charges, not merely acquitted. Id. at 642.
[9] Numerous other examples may be conjured to demonstrate that actual innocence should have no bearing. If, for example, inadequate advice or preparation led an attorney to advise a defendant to enter into a plea agreement, which results in a five-year term, when a competent performance by counsel would have resulted in a probationary term or a lesser prison sentence, the harm to defendant would be self-evident. Yet, in jurisdictions that require evidence of actual innocence, the defendant would be unable to pursue a malpractice action against his negligent attorneydespite the palpable damage caused because the claimant would be unable to plead or prove his or her innocence.
[10] We observe that our dissenting colleague has not been ableand neither are weto define precisely what exoneration should mean in this context. See Post at 298-99, 936 A.2d 1056-57. There may be cases in which exoneration should be viewed as occurring when the defendant obtains a new trial by way of either direct appeal or post-conviction relief, or when the defendant obtains an evidentiary hearing on his PCR petition, or not until the defendant succeeds in obtaining an acquittal of some or all of the charges lodged against him following a new trial. The question of exoneration, we assume, would turn largely on the nature of the alleged negligence; that will vary from case to case. Rather than allow accrual to turn on the nuances of each given case, we would exclude those questions from the accrual analysis and leave their consideration for the civil judge, who must, once something substantive occurs in the criminal matter, determine whether to lift the stay or await further proceedings in the criminal matter.
[11] We are unwilling to assume, as has our dissenting colleague, that our decision will open a floodgate of litigation. See Post at 296 n. 1, 936 A.2d 1054. It is no more likely that a malpractice action will be filed with everyone of the hundreds of PCR petitions filed in our trial courts each year than it is likely that a malpractice action will follow each of the thirty to forty cases in which post-conviction relief is granted each year.
[12] Our dissenting colleague finds it "significant" to his analysis that the defendant in Alampi was not a public defender and plaintiff's claim, therefore, was not impacted by the Tort Claims Act. Post at 299, 936 A.2d 1056-57. Although the Tort Claims Act generates a possibility, if not likelihood, that the public entities or employees who are defendants in a criminal malpractice action will be found immune for their negligent performancean issue not raised herewe find no cause to add further nuance to the issues posed by suggesting that a different approach to accrual ought to be adopted for private criminal defense attorneys.
[13] We do not expect that either the parties or our trial courts will be burdened by the cases that may hereafter be filed and stayed pending the completion of criminal proceedings. We would think that in most cases little will occur beyond the filing of a complaint and an answer. And, although it may be that some discovery might be appropriate in some cases to preserve evidence or memories, we leave the determination of whether or to what extent the parties may be permitted or required to engage in pretrial discovery prior to the entry of a stay to the sound discretion of the judges assigned to manage these cases.
[14] Alampi pled guilty to refusing to give information to the IRS in a tax investigation, a federal misdemeanor, 26 U.S.C.A. § 7203. In his malpractice action against Russo, his first attorney in the federal criminal matter, Alampi asserted that Russo had "neglected to keep him properly informed about the potential of a criminal investigation proceeding and failed to arrange for a meeting with the IRS in the fall of 1995, where the government could have been persuaded to either grant him transactional immunity or decline to prosecute him." 345 N.J.Super. at 365, 785 A.2d 65. As a result of his guilty plea, the judge sentenced Alampi to a twelve-month probationary term and imposed a $2,000 fine. Id. at 363, 785 A.2d 65. Alampi neither appealed the judgment of conviction or sought post-conviction relief.
[15] We are mindful of the federal district court decision in Alevras v. Tacopina, 399 F.Supp.2d 567 (D.N.J.2005), aff'd, 226 Fed.Appx. 222 (3d Cir.2007), which concluded that New Jersey law required the barring of a criminal malpractice action when the plaintiff had sought but failed to obtain post-conviction relief. This case dealt with the sufficiency of the evidence in support of the claim, not with the date upon which the action accrued. Moreover, the fact that a federal district court expressed its views on actual innocence and exoneration on November 23, 2005 demonstrates that plaintiff could not have been misled about the date of the accrual of this action when he filed his complaint on November 18, 2005. Plaintiff's delay in serving his notice of tort claim and in filing his civil complaint could not have been based upon an opinion that had not yet been written by a court whose decision would not be binding on our courts.
[1] According to information provided by the Criminal Division of the Administrative Office of the Courts, 807 petitions for PCR were filed last term. Of the 832 petitions disposed during the same period, only thirty-four were granted in whole or in part.
[2] The issue of immunity or scope of immunity has not been presented in this case. See Delbridge v. Office of the Pub. Defender, 238 N.J.Super. 288, 311, 569 A.2d 854 (Law Div. 1989), aff'd sub nom. A.D. v. Franco, 297 N.J.Super. 1, 687 A.2d 748 (App.Div.1993), certif. denied, 135 N.J. 467, 640 A.2d 849 (1994), cert. denied, Delbridge v. Franco, 513 U.S. 832, 115 S.Ct. 108, 130 L.Ed.2d 56 (1994).
[3] The states are split on issues including whether exoneration is required to commence a malpractice suit and when the statute of limitations is triggered or cause of action accrues. I cite only a few of the more recent decisions relevant to each point, but many contain reference, by footnote and otherwise, to the holdings and variations in the various states. See, e.g., Ang v. Martin, supra, 114 P.3d at 641, n. 3 and 4; Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 674, n. 2. The majority opinion collects and discusses the case law in a comprehensive and thorough fashion.
[4] I recognize that my approach elongates the period of accrual, but records in criminal cases must be retained for PCR and habeas corpus proceedings, and even under the majority approach they would have to be retained for lengthy periods until the elusive date of accrual occurs, notwithstanding the general PCR time bar embodied in R. 3:22-12.
[5] See Coscia, supra, 108 Cal.Rptr.2d 471, 25 P.3d at 674, n. 2.